**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

KATHLEEN HAGGERTY,
Plaintiff,

-against-

EDUCATION PLUS CORPORATION d/b/a THE FAMILY FOUNDATION SCHOOL; BETTY ARGIROS; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a “CINDY RAY”; JEFFREY BRAIN a/k/a JEFF BRAIN; NBT BANK, N.A.; NBT BANCORP INC.; SYSCO CORPORATION; SYSCO SYRACUSE, LLC; THE HANCOCK HERALD; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; FRENCH WOODS PERFORMING ARTS INC. d/b/a FRENCH WOODS SPORTS AND ARTS CENTER; K9-5 INC.; EAGLE VALLEY SEARCH, RESCUE AND RECOVERY TEAM, INC. d/b/a EAGLE VALLEY SEARCH DOGS; HIGHLIGHTS FOR CHILDREN, INC.; BOYDS MILLS (FORMERLY THE HIGHLIGHTS FOUNDATION); NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; LACKAWANNA COLLEGE; BINGHAMTON CITY SCHOOL DISTRICT; VILLAGE OF HANCOCK, NEW YORK, individually and through the VILLAGE OF HANCOCK POLICE DEPARTMENT; TOWN OF HANCOCK, NEW YORK; DELAWARE COUNTY SHERIFF’S OFFICE; COUNTY OF DELAWARE, NEW YORK; and DELAWARE COUNTY BOARD OF SUPERVISORS,
Defendants.

-------------------------------------------------------------------X

Case No.:
3:26 -cv- 2107 (AJB)

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kathleen Haggerty, by her attorneys, Johannesen & Umana, P.C., for her Verified Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1. From no later than August 1990 through the school’s 2014 closure, Defendants operated the Family Foundation School (“FFS”) in Hancock, New York, disguised to the public, to parents, and to the school districts that placed children there as a therapeutic boarding school for troubled adolescents. In reality, FFS confined the minor children placed in its custody, including Plaintiff

Kathleen Haggerty, withdrawn from her school district for the placement in December 1998 and delivered to FFS by her father at sixteen years of age on January 12, 1999 under the pretext that she was being driven to a job interview at a summer camp, and held there until she escaped in the first days of July 2000, at seventeen, under conditions of forced, uncompensated labor, public sexualized humiliation, punitive restraint and confinement, gender-based control and degradation, and the denial of medical care, while extracting tuition and charges from Plaintiff's family and, on information and belief, from the Binghamton City School District, on the representation that a girl with an eating disorder, and with what the adults around her characterized as behavioral difficulties, would receive the licensed therapeutic treatment she never received. Immediately upon her arrival, Plaintiff was made to strip and shower in front of a student and a staff member and, on information and belief, photographed. That night she ran, and a staff member and a senior student tackled her into barbed wire. Rather than receive any genuine clinical treatment, Plaintiff was made to declare herself an alcoholic and an addict, to confess before the assembled institution to smoking crack cocaine and to selling herself for it, none of which she had ever done, and was made to perform sustained forced labor that included pig duty, kitchen and dish duty, laundry duty, gardening, the stripping of the institution's floors, the scrubbing of its trailers and the painting of its buildings, office duty, the tutoring of other students, the operation of the institution's store, including the preparation of its purchase orders, and the supervision of other students on a trip to Canada, while the institution refused to fill the prescription a physician had written for her because it suspected she would misuse it, and, when she finally got away, instructed her parents not to take her home and not to support her.

2. FFS's unlicensed and abusive operation was already a matter of public record when Plaintiff arrived: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued

FFS a formal, public cease and desist order for operating without the license New York law required. Defendants continued to operate, enroll, and confine children, including Plaintiff, delivered to FFS more than eight years later, in open disregard of that order, while representing to Plaintiff's family and to the Binghamton City School District that FFS was a qualified therapeutic institution equipped to treat her.

3. Plaintiff came to FFS by deception. In December 1998, Plaintiff, then sixteen and in the tenth grade, was withdrawn from Binghamton High School for an out-of-district placement, and on January 12, 1999 her father told her that he was driving her to a job interview at a summer camp. She slept for most of the drive and woke at FFS, where she was surrendered into the institution's custody without having been told where she was going or why. That night, after being made to stand in the gymnasium and watch the student body scrub its floor with toothbrushes, she ran from her trailer after lights out and made it approximately a mile, to Whiting Road between the institution's barn and Route 97, before a staff member, Audra Runge, and a senior student tackled her into the barbed wire near the barn at the entrance to the property. On information and belief, FFS instructed placing parents on the transport of children to its campus and encouraged the practice of delivering children by pretext.

4. FFS took a girl with an eating disorder and, in place of treatment, made her declare herself an alcoholic and an addict, made her confess publicly to drug use and to prostituting herself for drugs that had never occurred, subjected her to public sexualized accusation and humiliation on a regular, if not daily, basis, required her, as what it called a lesson of its program, to sit alone for extended periods in the isolated gymnasium storage room in which its isolation closets were kept, with other children locked inside them, and threatened her with isolation, and, when a physician to whom the institution finally took her after two weeks without a bowel movement prescribed laxatives and

dietary changes, refused to provide either on the ground that she might misuse them. She escaped in July 2000, hid in Binghamton until her eighteenth birthday because, on information and belief at the institution's urging, her mother had reported her to the police and told her she would be returned to FFS and held there until she was twenty-one, returned to Binghamton High School on her own, and graduated a year behind her class, at nineteen, while nine months pregnant. Her parents, at the institution's direction, did not take her home and did not support her.

5. Following FFS's 2014 closure, its principals, Defendants Emmanuel Argiros and Cindy Argiros, moved the enterprise's remaining assets, including the FFS real property itself, into family-controlled entities and the hands of a longtime friend and neighbor of the Argiros family at below-market value rather than preserve them to answer for the decades of conduct described herein, and thereafter remained silent even after that conduct was judicially confirmed at the 2025 federal criminal trial of FFS staff member Paul Geer. The dormitories, the chapel, the kitchen, the floors Plaintiff stripped, the grounds she gardened, the trailers she scrubbed, the buildings she painted, and the fields on which she and the other children tended the institution's livestock, kept, cleaned, and maintained without pay, are the same structures and the same land on which the purchaser's affiliate, the French Woods performing arts camp, has housed, fed, and charged paying campers every summer since; on information and belief, that camp charges up to approximately $16,000 per camper for a summer on the campus the children of FFS built. The enterprise's last transaction was not a sale; it was the conversion of the children's labor into a revenue-producing property that still produces revenue today, for an entity that had been the Argiros family's neighbor and friend for many years, and that has never been asked to account for it.

6. The evidence and testimony adduced in the 2025 federal criminal prosecution of former FFS staff member Paul Geer, convicted on March 3, 2025 after a two-week jury trial and sentenced on

September 4, 2025 to 327 months in federal prison for sexually abusing and trafficking FFS students across state lines, including on the institution's recurring trips to Toronto, Ontario, Canada, on one of which Plaintiff herself was transported in the spring of 1999, revealed for the first time the coordinated, institutional, and enterprise character of the conduct at FFS across decades of its operation, including the deliberate destruction of student and abuse-complaint records by the Argiros family, facts Defendants had concealed for decades. That disclosure, and the events described herein, gave rise to the filing of this action.

7. Plaintiff brings this action seeking compensatory damages, trebled where applicable under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. § 1962 (RICO), 18 U.S.C. §§ 1589, 1590, 1591, and 1595 (Trafficking Victims Protection Reauthorization Act), 18 U.S.C. § 2255, and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, forced to labor, and subjected to the sanction regime described herein, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) the tuition payments giving rise to Plaintiff's RICO injury were transmitted to

and processed within this District; and (c) the federal criminal prosecution of Paul Geer described herein was conducted in this District.

11. This Court has personal jurisdiction over each Defendant because each Defendant resides in, is organized under the laws of, maintains offices or operations in, or transacted business in the State of New York, and because each Defendant committed acts and omissions giving rise to Plaintiff's claims in the State of New York.

## THE PARTIES

### Plaintiff

12. Plaintiff Kathleen Haggerty is an adult individual, born on September 12, 1982, who was enrolled at FFS from December 1998, when her school district withdrew her for the placement, and was confined there from January 12, 1999 until she escaped in the first days of July 2000, arriving at sixteen years of age and escaping at seventeen. Plaintiff was raised in Binghamton, New York, and currently resides in Holly Springs, Wake County, North Carolina.

13. Prior to her placement at FFS, Plaintiff was a tenth-grade student at Binghamton High School who had been diagnosed with an eating disorder, for which she had been treated by a dietitian in the Binghamton area, and who was described by the adults around her as having behavioral difficulties, conditions that required qualified treatment. She had consumed alcohol and marijuana on a few occasions. She was not addicted to any substance, had never used crack cocaine, and had never engaged in prostitution. She was not living at home at the time of the placement; she was living with her boyfriend and his mother, and it was from their home that her father collected her on the pretext described below. Her father was an alcoholic and her mother was mentally ill; both are now deceased.

14. Plaintiff's placement at FFS was an out-of-district placement, recorded on her Binghamton High School permanent record: the district withdrew her from Binghamton High School on December 12, 1998 for placement at the Family Foundation School, and recorded her return to the district on September 7, 2000. Plaintiff's parents are deceased and the family's records did not survive them; on information and belief, the cost of Plaintiff's placement at FFS was paid by her parents, from funds her father later told her had been set aside for her college education, and in part by the Binghamton City School District, from which, as Plaintiff's father told her, her mother sought payment, on information and belief at a rate of approximately thirty thousand dollars per year, by checks and payments transmitted from Binghamton, New York, through the United States mail. On information and belief, those payments were deposited to the School's operating account, which was operated by Sovereign Bank until November 10, 2000 and, from that date, by NBT Bank, which acquired the account with its deposit history. FFS represented to Plaintiff's parents and, on information and belief, to the school district that it was a qualified therapeutic boarding school staffed to treat adolescents with the conditions for which Plaintiff was placed there, which it was not. FFS thereby obtained payment, including, on information and belief, public funds, for a placement solicited on the representation that it would provide treatment.

15. On January 12, 1999, Plaintiff's father drove Plaintiff from Binghamton to the FFS campus in Hancock, New York, having told her that he was taking her to a job interview at a summer camp. Plaintiff slept for most of the drive and did not know, until she arrived, that she was being delivered to a residential institution. Immediately upon her arrival, Plaintiff, then sixteen years old, was strip searched pursuant to FFS's intake policy, required to remove all of her clothing and to shower in the presence of a staff member and a female student, a girl from Plaintiff's own home town and the daughter of a friend of her father, who, as she conducted the search, taunted Plaintiff with sexual

remarks about Plaintiff's boyfriend and his friends, and, on information and belief, Plaintiff was photographed. That same night, her first at the institution, Plaintiff was made to stand in the gymnasium while the assembled student body scrubbed the gymnasium floor with toothbrushes, and when she ran from her trailer after lights out, in the snow, and reached Whiting Road near the institution's barn, a staff member, Audra Runge, and a senior student tackled her into the barbed wire at the entrance to the campus, leaving her cut and bruised and her clothing torn; she received no medical attention, and she was required to go on wearing the torn and soiled clothing for approximately two weeks.

**Defendants**

16. Defendant Education Plus Corporation, doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise described herein operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which children, including Plaintiff, were recruited and confined. FFS misrepresented to parents that it provided qualified therapeutic, psychiatric, and psychological treatment services to enrolled students while it employed no qualified professionals with which to provide such services. In its final years of operation, FFS operated under the name Allynwood Academy.

17. Defendant Betty Argiros co-founded FFS together with her husband, Tony Argiros, and served as a founder, administrator, and Program Director of FFS throughout the period of Plaintiff's enrollment, during which Tony and Betty Argiros, though by 2000 no longer present at the institution day to day, retained and exercised authority over it. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the family-unit structure, the sanction

and work-labor system, the restraint and isolation regime, the intake strip search and photography practice, the blackout and dress-down practices described herein, and the culture of institutional secrecy within which the conduct described herein was able to occur. FFS's own published Handbook stated that Tony and Betty Argiros were the heads of the household, that they represented the parents of the house, and that they had the final say on all matters and did not have to explain themselves to students.

18. Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who succeeded Tony and Betty Argiros as president of the FFS board beginning in 1993 and who owned, operated, and directed FFS and Education Plus Corporation in that capacity throughout Plaintiff's enrollment and through the school's closure in 2014, and who, together with Defendant Cindy Argiros, was the family head of Family Three, the family unit in which Plaintiff was housed for the entirety of her enrollment, so that the sanctions, labor, and humiliation described herein were imposed on Plaintiff under his direct supervision. By 2000, Defendant Emmanuel Argiros had taken over the day-to-day operation of the institution. Defendant Argiros personally accompanied the students, including Plaintiff, on the 1999 transport to Toronto described herein, and personally destroyed evidentiary records by shredding, as described herein. Defendant Argiros currently owns and personally operates Kasos Enterprises LLC d/b/a Smith's Colonial Motel and Upper Delaware Inn in Hancock, New York, owns Kasos Co Family LP, which was an owner of the FFS real property, and owns K9-5 Inc.

19. Defendant Cindy Argiros, who publishes and is publicly known under the name "Cindy Ray" and as "Cindy Ray Argiros," is an individual who, on information and belief, is married to Defendant Emmanuel Argiros, and who, during Plaintiff's enrollment, was, together with Defendant Emmanuel Argiros, the family head of Family Three, the family unit in which Plaintiff

was housed for the entirety of her enrollment, supervised the sanctions, labor assignments, and food deprivation imposed upon its students, taught the government class in which Plaintiff was enrolled, and accompanied the students, including Plaintiff, on the 1999 transport to Toronto described herein. Defendant Cindy Argiros is the owner, editor, and publisher of Defendant The Hancock Herald, and is named in this action additionally with respect to the fraudulent concealment alleged in Count XII and the fraudulent conveyance described herein, as a beneficial owner and controller, together with Defendant Emmanuel Argiros, of the Kasos entities and K9-5 Inc. described herein.

20. Defendant Jeffrey Brain a/k/a Jeff Brain is an individual who served in FFS's senior leadership as its Director of Admissions for approximately nine years through the school's 2014 closure, and as its Vice President for External Relations, and, on information and belief, thereafter in the leadership of the school through its final years of operation as Allynwood Academy, in a tenure that began after Plaintiff's enrollment and continued the enterprise's marketing and concealment through its closure. As Director of Admissions, Defendant Brain directed the admissions and external relations apparatus through which the enterprise recruited and confined the children who followed Plaintiff, collected tuition, and concealed the conduct to which Plaintiff had been subjected. He is named as a Defendant with respect to the fraudulent concealment alleged in Count XII, the aiding and abetting of that fraud alleged in Count XIII, the enterprise concealment conduct alleged in Counts I and II, the knowing profit and advancement alleged in Counts V, XX, and XXI, and the obstruction of enforcement alleged in Counts XVIII and XIX. In his external relations capacity, Defendant Brain was the named contact for and, on information and belief, an author or approving officer of the institution's May 2008 public response to oversight hearings of the United States House of Representatives Committee on Education and Labor, in which the institution,

answering the congressional testimony of a former student, publicly characterized its practice of restraining students in blankets as a benign safety measure and marketed itself as a reformed and rigorous program, minimizing and mischaracterizing the institutional practices alleged in this Complaint, including the restraint practice carried out in Plaintiff's presence, continuing and maintaining the enterprise's concealment of that conduct and keeping the families of former students, including Plaintiff's, deceived as to what had been done to their children.

21. Paul Geer, who is not named as a defendant in this action, was employed by FFS from the 1990s through its 2014 closure, including as the director of its choir and as a staff member who organized and supervised its trips, and on March 3, 2025 was convicted by a federal jury in this District, after a two-week trial, of federal sex offenses committed against FFS students, including the transportation of children in FFS's custody in interstate and foreign commerce for sexual activity, on trips to Maine in 1994 and to Toronto in 2001, and was sentenced on September 4, 2025 to 327 months in federal prison. On information and belief, and as established at his criminal trial, Geer had confessed sexual misconduct with students to FFS's administration before Plaintiff's enrollment, and FFS, through the Argiros Defendants, kept him on staff and in the custody of children, including on its trips out of the State and out of the country, throughout Plaintiff's enrollment, during which the institution's recurring trips to Toronto, including the trip on which Plaintiff was transported, were conducted under the same supervision and in the same course of conduct as the 2001 Toronto trip for which Geer was convicted.

22. Defendant Kasos Co Family LP is a New York limited partnership owned and controlled by the Argiros Defendants, which held title to the FFS real property and transferred it to Defendant Chapel Hill Land Holdings LLC in November 2014 at below-market value. Defendant Kasos

Enterprises LLC is a New York limited liability company likewise owned and controlled by the Argiros Defendants.

23. Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016, in each case with actual or constructive notice of the claims against the transferors. On information and belief, Chapel Hill Land Holdings LLC is the acquisition entity of, or is affiliated with, the French Woods performing arts camp, the purchaser identified in the school's own closing announcement, which described the purchaser as "a neighbor and friend of the school and the Argiros family for many years." On information and belief, institutional records of FFS that survived the destruction described herein remained on the former campus property after the 2014 closure, stored in an outbuilding on that property, within the possession and control of Chapel Hill Land Holdings LLC as its owner, for approximately a decade, and were never voluntarily disclosed or produced to law enforcement, being recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial. On information and belief, the November 2014 conveyance of the FFS campus was made for consideration of approximately two million dollars, a price materially below the value of the property conveyed, which comprised a multi-structure campus improved and maintained over decades by the uncompensated labor of FFS students, including Plaintiff. On information and belief, since acquiring the campus, Chapel Hill Land Holdings LLC and the French Woods camp with which it is affiliated have operated a residential summer camp on it, housing campers and staff in the dormitories, feeding them from the kitchen, and using the chapel, the fields, the grounds, and the outbuildings, so that the buildings and grounds that FFS children built, repaired, cleaned, and maintained without pay have been put to commercial use

every season since, and Chapel Hill Land Holdings LLC continues to receive the benefit of that labor with each season it operates: on information and belief, the camp charges each camper's family tuition of thousands of dollars per session, up to approximately $16,000 per camper for a full summer, and the dormitories, dining facilities, chapel, fields, and grounds for which those families pay are the ones the children of FFS, including Plaintiff, built, repaired, cleaned, and maintained without pay. That benefit is not historical: it is received anew each year, on property whose improvement and upkeep were the children's work, by an entity that had been, in the school's own words, a neighbor and friend of the school and the Argiros family for many years, and that, on information and belief, knew from that relationship how the campus it bought had been run. Chapel Hill Land Holdings LLC knew, or recklessly disregarded, what the property it took had been and how it had been built and kept, and it turned a blind eye to that knowledge because the transaction was profitable. It was not a purchaser without notice. It took the campus as a transferee with actual or constructive notice of the claims against its transferors, for less than its assessed value, from the family-controlled entity into which the Argiros family had moved the property when the State came to investigate, at a time when the School had been publicly accused, publicly investigated, and publicly closed, and it took it on the financing of the School's own secured lender, which released its liens on the School's collateral one month after the conveyance and took the buyer as its new borrower. Its principal, on information and belief Ronald Schaefer, the founder of the French Woods camp, sits on the board of Hancock Partners, Inc. under Defendant Emmanuel Argiros, the School's president, alongside the manager of the NBT Bank branch that handled the School's payroll; the School, the bank that held and lent its money, and the buyer that took its land are represented on one board by the people who ran them. The School's own closing announcement identified the purchaser as a neighbor and friend of the School and the Argiros family for many

years. The buyer took the dormitories, chapel, kitchen, and grounds as they stood, built and maintained by children without pay, with the School's records in an outbuilding on the premises, and put them to paying use the next summer. Those are the facts of a party that knowingly benefits, financially and by receiving things of value, from participation in a venture it knew or should have known was engaged in forced labor: it received the venture's principal asset at a discount, from an insider, on the venture's own credit, with the venture's evidence on the property, and it has drawn revenue from that asset every season since. NBT Bank and Chapel Hill Land Holdings LLC profited from the same labor through the same property, the bank by lending against the collateral the children built and taking its payoff when that collateral was sold, the buyer by acquiring and operating it, and both sit, through their principals, on the board of the corporation the School's president leads. The 2014 conveyance was not a sale to a stranger. It was the transfer of the enterprise's principal asset to a knowing beneficiary, on the enterprise's own bank's money, for less than it was worth, after the enterprise had been accused, and that is how both of them have kept it. Defendant French Woods Performing Arts Inc., doing business as French Woods Sports and Arts Center, is, on information and belief, a New York business corporation with its principal place of business at Hancock, New York, which operates the residential summer camp on the former FFS campus at 431 Chapel Hill Road and is the operator of record of that camp with the American Camp Association; it is, on information and belief, owned and directed by Ronald Schaefer, its founder, and Beth Schaefer, and is the entity through which the Schaefer family operates the French Woods camps. French Woods Performing Arts Inc. took possession of the campus at or about the time of the November 2014 conveyance and has operated it as a camp every season since, housing, feeding, and charging campers for the dormitories, dining facilities, chapel, fields, and grounds that the children of FFS, including Plaintiff, built and maintained without pay, at a charge,

on information and belief, of approximately $4,500 per three-week session per camper and up to approximately $16,000 per camper for a full summer. Its directors and staff occupied and used the campus and its outbuildings each season from 2015 forward; on information and belief it had possession and control, with Chapel Hill Land Holdings LLC, of the outbuilding in which the School's records were kept, and it was the entity on the campus from which the Argiros family retrieved School records after the closure, as the Argiros family testified at the Geer trial. French Woods Performing Arts Inc. knew, or recklessly disregarded, what the campus it operated had been and how it had been built, and it has knowingly benefited, financially and by receiving things of value, from participation in the venture by taking that campus as its inventory and drawing revenue from it every season since. On September 10 and again on September 29, 2026, Plaintiff's counsel served Chapel Hill Land Holdings LLC, through its attorneys, with a Notice to Preserve Evidence and a Notice and Request for Entry Upon Land for Inspection directed to the outbuilding on the former campus at 431 Chapel Hill Road and the records stored in it. On October 2, 2026, Chapel Hill Land Holdings LLC, through its attorneys, responded in writing that it "is not aware of any such shed," that "there is nothing to inspect," that it is "an innocent purchaser of land that has absolutely nothing to do with the events at issue in this litigation," and that it "will not make the premises available for inspection." A federal agent took part in the search of that campus under a federal warrant and recovered from it the School's records that were used at the 2025 criminal trial, as he testified under oath at that trial; Chapel Hill Land Holdings LLC now denies that the structure from which they were recovered is on the property. On information and belief, the outbuilding and the records within it existed on the campus, within the possession and control of Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc., when the notices were served, and the

October 2, 2026 denial and refusal was a further act of concealment, made with knowledge of this litigation and of the federal proceedings that preceded it.

24. Defendant K9-5 Inc. is a New York corporation, formally incorporated in 2014 immediately after FFS ceased operations, to which the Argiros Defendants transferred the enterprise's canine operation and related assets, including the dogs for whose care and training FFS students had been used as unpaid labor.

25. Defendant NBT Bank, N.A. is a federally chartered national bank that, directly and through its predecessor, has maintained a continuous banking presence in the Village of Hancock, New York since 1907, a period encompassing the entirety of Plaintiff's 1999-2000 enrollment and FFS's operational life from its founding through its 2014 closure, and that was at all relevant times the sole commercial bank in a village of fewer than 1,200 residents. From November 10, 2000, and at all relevant times thereafter, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and, on information and belief, in the names of its principals, through which the tuition payments, including, through the deposit history the bank acquired on that date, the record of the payments made on Plaintiff's behalf, and, on information and belief, the wages the institution paid Plaintiff in 2004, the payroll of the institution's staff, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed. As the bank serving the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from that account relationship, and knew or should have known from the scale of that revenue and the publicly available record of FFS's unlicensed and abusive operation, including the August 1990 cease and desist order, that the institution from which it was receiving that benefit was operating unlawfully. The public record shows blanket security interests in Education Plus Corporation's operating assets filed in 2002, 2004, and 2006,

covering the operation's equipment, inventory, accounts, general intangibles, and contract rights together with their proceeds, so that the bank's collateral included the tuition receivables and enrollment contracts themselves, including the contract under which Plaintiff was enrolled, the livestock Plaintiff raised, and the food inventory Plaintiff unloaded from Sysco's trucks; new security interests taken from both Education Plus Corporation and Kasos Co Family LP on November 19, 2008, months after the congressional hearings described herein; a recorded loan of six hundred eighty thousand dollars to Kasos Co Family LP, the family entity then holding title to the FFS campus, on March 24, 2010; continuations of its filings in 2010, 2011, and 2013; Uniform Commercial Code termination statements filed on December 12, 2014, in the course of the wind-down, releasing the liens on the school's collateral while the banking relationship itself continued; and, on February 27, 2015, a new blanket security interest against Chapel Hill Land Holdings LLC. On information and belief, the bank's own underwriting and collateral standards required, as a condition of extending and continuing that secured credit, the inspection of the collateral and the campus, the appraisal of the campus, and the review of the operation's financial statements, and the bank repeatedly conducted those inspections and reviews over the life of the relationship; had it done so, it would have seen an operation whose only revenue was tuition, whose expenditures on the housing, feeding, and staffing of the children in its custody fell far below what any lawful residential facility spends, and whose margin was made by the children's unpaid labor, and whose capacity to repay depended on the continued confinement of those children; and if the bank did not do so, its departure from its own standards was a deliberate avoidance of the knowledge those standards exist to supply. On either footing, the bank knew or consciously avoided knowing. The bank did not need to ask anyone for the operation's financial records: it already held them, because the operation's accounts were the bank's own accounts, and every tuition deposit, every

disbursement, and every payroll check passed through the bank's own ledgers. Federal law required NBT Bank, as a national bank, to maintain a program to know its customers and to detect and report suspicious activity, and under that program and the bank's own standards the bank was required to know who owned and controlled the School, the nature and purpose of its accounts, and the source of the funds that moved through them; that obligation did not end at the opening of an account but attached anew to each credit decision and each periodic review of the relationship, so that knowing what the School was and how it made its money was not a matter of the bank's discretion but of its continuing legal obligation. The bank discharged that obligation, or was required to, at identifiable moments: on information and belief, when it acquired the School's account on November 10, 2000 and re-documented the acquired accounts in its own name; when it took its first blanket security interest in the School's receivables, inventory, and contract rights on December 2, 2002, and again at each renewal in 2004, 2006, 2008, 2010, 2011, 2013, and 2016; when it underwrote the March 24, 2010 mortgage; and when it financed the transferee in 2015. At each of those moments the bank was required, under the program federal law obliged it to maintain and under its own standards, to know its customer: who owned and controlled the School, the purpose of its accounts, the source and character of the funds moving through them, and the risk the relationship presented. On information and belief, in discharging that obligation the bank knew that the School's only revenue was tuition paid for children held in residential custody, that the payroll the bank itself cut and cashed carried no licensed psychiatrist, physician, or clinical professional, and that the School's expenditures bore no relation to the housing, feeding, and staffing of the children whose tuition it was; and if the bank did not know those things, it was because it did not perform the inquiry that federal law and its own standards required, a deliberate avoidance of the knowledge that inquiry exists to supply. On either footing the knowledge is the bank's. Because it

was at once the depository and the secured lender, NBT Bank saw both sides of the operation. From its own ledgers it saw what came in, tuition paid for children held in residential custody, and what went out. From the appraisals and inspections its secured lending against the campus required, it saw what stood on the land it lent against and what was added to it from one credit renewal to the next: the dormitories, the chapel, the kitchen, the fields, and the grounds, improved, repaired, and maintained between inspections. On information and belief, the accounts the bank held showed no payments to contractors, builders, or tradesmen commensurate with those improvements, and no payroll for the maintenance, custodial, kitchen, laundry, and grounds staff that a residential facility for that number of children requires, because the children were doing that work; the collateral the bank appraised grew while the expenditures that should have produced it did not appear in the accounts the bank held. On information and belief, the same inspections showed the bank the housing in which the children it lent against were kept, including converted barns and trailers in which the children slept in rooms fitted with multiple sets of bunk beds, several children to a room, and a plant that, on information and belief, could not lawfully house the number of children whose tuition the bank was taking in. On information and belief, NBT Bank appraised and lent against improvements for which no construction payments passed through the accounts it held, on a campus it had inspected and knew to be housing more children than its structures were built to hold, and it knew, or consciously avoided knowing, that those improvements were the children's work. The money paid for Plaintiff's enrollment did not leave the enterprise when she did. On information and belief, the tuition her family paid became the operation's receivables, deposits, and working capital, was spent on the operation's continuation and on the campus, inventory, and improvements against which the bank lent, and was carried, as the proceeds and the collateral of the enterprise, in the accounts and under the liens the bank held and renewed through December 18,

2021, so that the bank's obligation to know its customer, and its knowledge of what the customer was, attached not only to the years of Plaintiff's enrollment but to every year in which it continued to hold, lend against, and profit from what her family had paid. Neither the 2008 congressional testimony nor the 2014 closure and sale, nor the 2024 indictment, nor the 2025 conviction of Paul Geer, prompted the bank, on information and belief, to file a Suspicious Activity Report, or prompted it to make any report to any regulator or law enforcement agency, to freeze or hold any account, funds, or transaction pending inquiry, as banks routinely do, or to decline the transactions before it; instead, on information and belief, the bank financed the conveyance of the campus, collected satisfaction of its own credit from it, and took the transferee as a new lending customer. NBT Bank's repayment under those instruments depended on the School's continued enrollment of children and continued receipt of tuition. Its return was not a fee on a customer's ordinary accounts but a stake in the operation itself, and its interest, like that of every Hancock business the School's revenue supported, was in that operation continuing. As the only commercial bank in the Village of Hancock, NBT Bank held the village's deposits, extended its credit, and financially sponsors the corporation whose stated purpose is to "combat community deterioration"; on information and belief, a substantial share of the Hancock branch's deposits and lending derived from the School's revenue and the families and businesses that revenue sustained, so that the bank's position in the village, like the village's, was bound to the School's survival. NBT Bank's relationship with the School's president was institutional, not personal. NBT Bank is a member, in its own name, of the Hancock Area Chamber of Commerce, is listed in the Chamber's directory as its banking member on a website published by the Town of Hancock, and pays its dues into a treasury Defendant Emmanuel Argiros keeps as the Chamber's treasurer. NBT Bank financially sponsors Hancock Partners, Inc., the economic-development corporation Defendant Emmanuel

Argiros presides over, and Dawn Joyce, the manager of NBT Bank's Hancock branch for approximately eighteen years, whose duties included the School's accounts and credit, serves under Defendant Emmanuel Argiros as a director of that corporation. Her knowledge of the School, its finances, and its president, acquired in managing the branch that held the School's accounts and administered its credit, was material to her duties and is the knowledge of NBT Bank. The relationship ran in both directions. NBT Bank receives, through the same apparatus, the promotion of its own business: it is held out, on the Chamber of Commerce directory the Town publishes, as the community's bank, the only banking member listed, in a directory kept by the School's president as the Chamber's treasurer; through its branch manager's seat on the Partners board it is placed before the businesses and projects that corporation serves, under a president who was the bank's customer; and, on information and belief, it has drawn deposits, loans, and customers from that standing. That standing, conferred through organizations the School's president ran and whose own revenue depended on the School, was a thing of value the bank received from the relationship and had reason to keep. NBT Bank did not open the School's operating account; it bought it. On November 10, 2000, NBT Bank, through its Pennstar Bank division, purchased six branches of another bank, with approximately $96.8 million in deposits, including the branch at which the School's operating account was maintained, and from that date the School's account, its number and history unchanged, was an NBT Bank account, so that the account into which the tuition paid for Plaintiff's enrollment had been deposited since January 1999 became, with its deposit history, an NBT Bank account four months after her escape, and the wages the institution paid Plaintiff in 2004 were, on information and belief, drawn on NBT Bank through its Hancock office. NBT Bank's own statements to its stockholders describe the position from which it saw the School. In its investor materials NBT Bank reported that, as of June 30, 2010,

it ranked first among all banks in Delaware County, New York, where the School sat, with five branches and more than a quarter of all deposits in the county, and third in Susquehanna County, Pennsylvania, where the School's operating account was kept, with six branches and more than a fifth of the county's deposits; that in thirty of the communities it served it was the only bank in town; and that its strategic focus was organic growth, "particularly in the area of core deposits." When it formed Pennstar Bank from the Pennsylvania branches it acquired in 2000, its chief executive described the strategy as "maintaining the local decision making and high service levels that are essential elements of our community banking philosophy." On information and belief, consistent with those statements, decisions concerning the School's accounts and credit were made locally, by officers in the Hancock and Montrose offices who saw the School, its president, and its money directly, and the School's deposits were the kind of core deposits NBT Bank identified as its principal object of growth and the foundation of its lending. On information and belief, the bank's payroll ledger for the enterprise records every paycheck issued to Paul Geer from the 1990s through the 2014 closure, that is, for the entire period after FFS's administration had been told of Geer's confessed sexual misconduct with students and had decided to keep him; the bank processed and cleared those payments, held the record of them, and, after the 2024 indictment and the 2025 conviction publicly established what they had paid for, did not review, freeze, report, or otherwise act upon the accounts through which Geer had been paid or the accounts of the principals who had paid his. On information and belief, the bank likewise took no step, after the indictment or the conviction, to freeze, review, or report the accounts of Chapel Hill Land Holdings LLC, the transferee whose acquisition of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call,

terminate, or withdraw the credit it had extended against that property, so that the bank remains today the financier of the entity that holds the enterprise’s principal asset.

26. Defendant NBT Bancorp Inc. is the controlling parent of NBT Bank, N.A. and is named in that capacity.

27. From December 2, 2002 through December 18, 2021, without interruption, NBT Bank, N.A., directly and through Pennstar Bank, a division of NBT Bank, N.A., held one or more perfected security interests in the collateral of Education Plus Corporation. The public record shows blanket security interests filed against Education Plus Corporation in New York on December 2, 2002, January 30, 2004, May 30, 2006, and November 19, 2008, and in Pennsylvania on December 18, 2006; a security interest filed against Kasos Co Family LP on November 19, 2008; continuations filed on December 13, 2010, June 21, 2011, and October 31, 2013; the mortgage loan of March 24, 2010 to Kasos Co Family LP against the campus; the New York releases of December 12, 2014; and a Pennsylvania continuation filed on September 15, 2016. That secured position began two years after Plaintiff’s departure, on collateral her labor and the labor of the children after her had built and maintained, and outlasted the school’s closure by seven years.

28. On December 12, 2014, one month after Kasos Co Family LP conveyed the campus to Chapel Hill Land Holdings LLC, NBT Bank released its New York liens on the school’s collateral. On February 27, 2015, NBT Bank filed a new blanket security interest against Chapel Hill Land Holdings LLC covering its equipment, fixtures, inventory, accounts, contract rights, general intangibles, timber, and oil, gas, and minerals, a lien that remained in force through February 27, 2020. On information and belief, NBT Bank’s loan to Chapel Hill Land Holdings LLC funded the conveyance of the campus, and NBT Bank was repaid its own credit to the school from the proceeds of that conveyance.

29. On September 15, 2016, nearly two years after the school closed, NBT Bank renewed its blanket security interest in the collateral of Education Plus Corporation by continuation, so that NBT Bank held that lien every day through December 18, 2021. Under the Uniform Commercial Code a perfected security interest lapses five years after filing; it can be continued only by a continuation statement filed within the six months before lapse and only with the secured party's authorization; and absent that filing NBT Bank's lien would have ended on December 18, 2016. NBT Bank chose to continue it. On information and belief, NBT Bank collected interest, fees, and other charges on its secured credit throughout that period.

30. On information and belief, as of the filing of this action NBT Bank still holds the accounts of the Argiros family, of Kasos Co Family LP and Kasos Enterprises LLC, of K9-5 Inc., and of Chapel Hill Land Holdings LLC, and holds the proceeds of the enterprise's assets, and it has never terminated its relationship with the enterprise or its principals. On information and belief, NBT Bank placed no hold on any of those accounts and made no disclosure to any authority at the April 2024 indictment of Paul Geer, at the execution of the federal search warrant on the former campus, during the February 2025 trial, or upon the March 3, 2025 conviction, and has not provided its records of the enterprise to the federal authorities handling the Family Foundation School matter.

31. Defendant Sysco Syracuse, LLC is a Delaware limited liability company with its principal place of business in Warners, New York, and is the Sysco Corporation operating subsidiary whose central New York distribution territory includes Delaware County, New York. On information and belief, Sysco Syracuse, LLC distributed food and institutional supplies to FFS on a recurring, scheduled basis during the relevant period, delivering by truck to the FFS campus, and was paid for those goods and deliveries from the tuition-funded accounts described herein, while students at the institution, including Plaintiff, unloaded those deliveries as part of the uncompensated labor

described herein. Defendant Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas, and is the controlling parent of Sysco Syracuse, LLC, named in that capacity (together with Sysco Syracuse, LLC, "Sysco").

32. Defendant The Hancock Herald is the local newspaper serving the Village of Hancock, owned and controlled at all relevant times by Defendant Cindy Argiros, a principal of the enterprise, which published promotional content concerning FFS furthering the enterprise's fraudulent marketing of the school while not reporting the 1990 cease and desist order, the 2008 congressional oversight hearings into the institution held after Plaintiff's enrollment, or other matters of public concern regarding FFS's operation, and, until very recently, declining to publish any story concerning matters in which FFS students were involved.

33. Defendant Village of Hancock, New York is a municipal corporation organized under the laws of the State of New York, sued individually and through the Village of Hancock Police Department ("Hancock PD"), the municipal police department owned, operated, funded, and controlled by the Village and through which the Village acted in the events described herein, including the standing practice of locating children who fled FFS and returning them to the institution's custody.

34. Defendant Town of Hancock, New York is a municipal corporation organized under the laws of the State of New York, separate and distinct from the Village of Hancock, within whose borders the FFS campus at 431 Chapel Hill Road is located. At all relevant times, including during Plaintiff's enrollment, the Town exercised governmental authority over the territory on which FFS operated and possessed the official notice of FFS's unlicensed operation described herein, including, from December 2010, the joint findings of four New York State agencies that former students' accounts of abusive practices were credible, yet permitted FFS to continue operating. Defendants NBT Bank, Chapel Hill Land Holdings LLC, the Hancock Herald, the Village of Hancock, and the Town

of Hancock knew, or recklessly disregarded, what the School was, and each turned a blind eye to it because the relationship was profitable. The reasons were financial, and they were the town's. The campus was purchased, as the School's president testified at the 2025 Geer trial, with a down payment contributed by affluent members of the Hancock community, so that from its founding the School was an investment of the town's own money, made in a village that, on information and belief, was losing a tenth of its population in those years and had no other enterprise of its size to replace what it was losing. For the next quarter century the School's revenue, approximately $30,000 per child per year during Plaintiff's enrollment and far more thereafter, paid for by families from outside the town and deposited inside it, was one of the largest sources of payroll, purchasing, lodging, and patronage in a village of fewer than 1,200 people. A town that small, losing people, has one objective in its commerce, which is to keep what it has; and from 2006 forward the man charged with that objective was the man who ran the School. In 2006 Defendant Emmanuel Argiros joined the board of Hancock Partners, Inc., the economic-development corporation whose stated purpose is to combat community deterioration, served as its vice president and treasurer, and has been its president since 2022; he is also the treasurer of the Hancock Area Chamber of Commerce; and the Town of Hancock publishes both organizations' websites. The institutions whose function was to keep Hancock's commerce going were, from 2006, run by the owner of the commerce they were keeping, and the School was that commerce. Every other institution with a reason to look at the School had a larger reason to keep it open. NBT Bank held the School's deposits, lent against its receivables and its land, and could be repaid only if children kept arriving and parents kept paying; its benefit was not only the interest and fees it earned for nineteen years on that credit, its payoff from the 2014 sale, and its loan to the buyer, but the relationship itself, which it chose to continue, through every notice event described herein,

rather than lose the School's deposits, its credit, and the payroll and household accounts that depended on them. Chapel Hill Land Holdings LLC and the French Woods camp of Ronald Schaefer, who on information and belief is a principal of Chapel Hill, bought the campus below its assessed value and have charged campers to use the buildings the children built every summer since. The Hancock Herald, which Defendant Cindy Argiros ran under the name Cindy Ray, drew its advertising from the Argiros family's businesses and printed the School's promotional content rather than the complaints against it. The Village and the Town took the School's payroll, its purchasing, and its visitors as the local economy, and their police returned the children who ran. Each of those institutions saw the School from the inside: the bank saw the money come in and the collateral it was lent against, the Herald covered the campus, the buyer was a neighbor and friend of the family for many years, and the Village's own officers walked escaped children back through its gates. And the people who ran them sat at one table, under Defendant Argiros: NBT Bank is a member of the Chamber whose treasury he keeps and sponsors Hancock Partners, on whose board the manager of NBT Bank's Hancock branch, Dawn Joyce, and, on information and belief, Ronald Schaefer, sit under him. The knowledge of the branch manager who sat on the School president's board was the knowledge of NBT Bank, because she acquired it in the course of the very relationship the bank employed her to manage; and each Defendant, having that knowledge or recklessly disregarding it, chose the relationship over the children, through the 1990 cease and desist order, the 2008 congressional hearings, the 2010 findings of four State agencies, the 2014 closure and conveyance, the 2024 indictment, and the 2025 conviction. Nothing has changed since. On information and belief, as of the filing of this action, after the April 2024 federal indictment of a longtime FFS staff member for crimes against FFS children, after the February 2025 public trial at which the School's president admitted under oath that its records had been destroyed, after the

March 3, 2025 conviction, and after the commencement in 2026 of more than twenty actions in this District alleging the conduct described herein against the same Defendants, Defendant Emmanuel Argiros remains the treasurer of the Hancock Area Chamber of Commerce and the president of Hancock Partners, Inc.; NBT Bank remains a member of the Chamber and a sponsor of Hancock Partners, its branch manager remains a director under him, and it remains the holder of the accounts described herein and the lender to the entity that holds the campus; the French Woods interests remain on that board and in operation on the campus; and no Defendant has suspended, removed, or disassociated from any of them, called or withdrawn any credit, closed any account, or disclosed anything to any authority.

35. Defendant Delaware County Sheriff's Office is the law enforcement agency for Delaware County, New York, in which FFS is located, and Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County. Defendant County of Delaware, New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period and which is the entity liable for the customs, policies, and practices of the Sheriff's Office and Board of Supervisors alleged herein.

36. Defendant Lackawanna College is a private college organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 501 Jefferson Avenue, Scranton, Pennsylvania. During Plaintiff's enrollment, Lackawanna College offered college-credit courses on the FFS campus, taught, on information and belief, by FFS staff members, including the mathematics courses in which Plaintiff was enrolled, taught by FFS staff member Jim Kavarnos, and, on information and belief, charged and received payment for those courses from the families of FFS students, including Plaintiff's, through the institution's tuition-funded accounts.

Lackawanna College thereby received recurring payment from the operation described herein and lent it the legitimacy of an accredited college's coursework, on which placing families and school districts relied, while its courses were delivered on the campus by the institution's own staff, who observed and administered the conditions described herein. Lackawanna College knew or should have known, through the staff who taught its courses on the campus and through the institution's public record, of the nature of the operation from which it was receiving payment, and is named as a knowing beneficiary of and participant in that operation.

37. Defendant Binghamton City School District (the "District") is a public school district organized under the Education Law of the State of New York, with its offices in Binghamton, New York, within this District, and the district in which Plaintiff was enrolled at Binghamton High School. On December 12, 1998, the District withdrew Plaintiff from Binghamton High School for an out-of-district placement at FFS, so recorded on her permanent record, and, on information and belief, paid public funds toward the cost of that placement until her return to the District on September 7, 2000. The District placed a student for whom it was responsible, a sixteen-year-old with an eating disorder and what had been characterized as behavioral difficulties, in a residential institution outside the District without determining that the institution held the license, the clinical staff, or the services required to treat the conditions for which it placed her there, notwithstanding that the institution had been operating since August 1990 under a public cease and desist order for operating without the license New York law required; without ensuring that any of the services for which the placement was made existed at the institution; and without monitoring the placement, and the placement remained in force while Plaintiff was subjected to the conduct described herein. The District has represented that it holds no record of the placement beyond Plaintiff's transcript.

The District is named with respect to the negligent placement and supervision alleged in Count X and the advancement of labor trafficking alleged in Count V.

38. Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, including FFS, which was a founding member of NATSAP. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and marketing materials, which were used by parents, by education consultants, and by referring programs, as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS throughout the period of FFS's membership and knew or should have known that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed.

39. Rita Argiros, who died in 2015 and is not named as a defendant in this action, was the daughter of FFS's founders, the sister of Defendant Emmanuel Argiros, and the daughter of Defendant Betty Argiros. In 2000, during Plaintiff's enrollment, Rita Argiros became the Executive Program Director of FFS, a role in which, by her own published account, she reshaped the practices and procedures of the school, and in which she held authority over the sanction, labor, isolation, and food regime imposed upon Plaintiff, and she founded the school's canine program, known as the Dog Corps, which she ran with the unpaid labor of FFS students. Rita Argiros was simultaneously the founder and president of the search dog organization named in the following paragraph. Her conduct is alleged as conduct of the enterprise and of Education Plus Corporation.

40. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., doing business as Eagle Valley Search Dogs ("Eagle Valley"), is a New York not-for-profit corporation with a principal

place of business in Wurtsboro, New York, founded and presided over by Rita Argiros. On information and belief, Eagle Valley and Defendant K9-5 Inc. are one canine operation held under two names: the search-and-rescue dog operation that Rita Argiros conducted in common with the school's Dog Corps, and the entity that Defendant Emmanuel Argiros incorporated in 2014, immediately upon the school's closure, to receive the school's dogs and the assets of its canine program, the two sharing, on information and belief, principals, premises, and animals, so that the dogs, equipment, and going-concern value of the enterprise's canine program passed at the 2014 closure into the one, the other, or both, and Eagle Valley is named together with K9-5 Inc. so that those assets are reached whichever entity holds them. Upon information and belief, throughout Plaintiff's enrollment the enterprise's canine operation and Eagle Valley's operation were conducted in common by the same Argiros family principal; the unpaid labor of FFS students, who walked, fed, cared for, and served as training subjects for the school's dogs, supported the care, maintenance, and training of dogs from which Eagle Valley's operation benefited; the kitchen, grounds, livestock, and custodial labor of the student body as a whole, including Plaintiff's, ran the institution within which that canine operation was housed, fed, and maintained; and Eagle Valley thereby maintained, through its own founder and president, a continuous relationship with the enterprise, knew, through his, of its nature, and knowingly benefited from the forced labor of the children in its custody.

41. Jan Cheripko, who died in 2024 and is not named as a defendant in this action, was employed for ten years, from 1990 to 2000, by Boyds Mills Press, the book publishing arm of the Highlights organization, during a period in which he was also involved at FFS as a part-time English teacher; joined FFS full-time in 2000, during Plaintiff's enrollment; served as an FFS English teacher and, from approximately 2001, as a family leader; and remained at FFS until June 2013, while

remaining a Boyds Mills author. Through Cheripko, the publishing organization named in the following paragraph was embedded in the purported education the enterprise sold to paying families and had, in its own longtime employee and author, direct knowledge of the institution's practices.

42. Defendant Highlights for Children, Inc. and Defendant Boyds Mills (formerly the Highlights Foundation) (together, the "Highlights Defendants") are affiliated entities that publish the Highlights magazines and operate, among other things, a retreat property of approximately 1,300 acres in Wayne County, Pennsylvania. The January 2026 renaming of the Highlights Foundation as Boyds Mills reflects an unbroken continuity of the same entity. The Highlights Defendants' publications and programs were integrated into the purported education for which the enterprise's families, including Plaintiff's, paid: upon information and belief, FFS purchased Highlights publications for use in the school's purported educational program with tuition-funded money, so that a portion of the tuition extracted from the enterprise's families flowed directly to the Highlights Defendants; the uncompensated forced labor of the children subsidized the operation from which those payments were made; and FFS students were brought to the Highlights Defendants' Wayne County retreat, where they performed uncompensated labor from which the Highlights Defendants benefited. The Highlights Defendants thereby knowingly benefited, financially and by receiving things of value, from a venture engaged in forced labor, labor trafficking, and sex trafficking as alleged herein, and knew or should have known, through Cheripko, their own longtime employee and author embedded on the campus, of the nature of that venture.

## FACTUAL ALLEGATIONS

**A. The Family-Unit Structure and Institutional Control**

43. When Plaintiff arrived at FFS in January 1999, the school's population was divided into several "family" units, each housed and supervised separately. Plaintiff was assigned to Family Three, whose family heads, for the entirety of her enrollment, were Defendants Emmanuel Argiros and Cindy Argiros, and was housed in one of the trailers in which FFS housed its students. FFS's institutional structure vested near-total control over students' daily lives, movement, and contact with their families in the family-unit staff, a structure that both enabled and concealed the conduct described herein.

44. Control was enforced through a system of "sanctions," punishments imposed at the discretion of staff, including, in Plaintiff's case, work sanctions, confinement to a corner, assignment, for extended periods, to the isolated gymnasium storage room in which the institution's locked isolation closets were kept, and the standing threat of isolation, public accusation and humiliation at the table, food sanctions, and the withholding of privileges, each of which set a student back in "the program," so that each sanction extended the time the student would remain at the school and the tuition and charges the institution would collect for her. The program itself was a religious, twelve-step program imposed on children who were not addicts, under which a child's own judgment was treated as defective and resistance as evidence of something wrong within the child. The students lived in constant fear of being singled out for sanction, a fear FFS cultivated deliberately and used as its principal instrument of control.

**B. Recruitment, the Out-of-District Placement, and the Financial Arrangements**

45. Plaintiff was placed at FFS through an out-of-district placement from Binghamton High School for an eating disorder and what was then characterized as behavioral difficulties. Plaintiff's mother

arranged the placement; her father carried it out. FFS marketed itself to placing families and to school districts, including Plaintiff's, through its promotional materials and representations that it was a qualified therapeutic institution staffed to provide psychiatric, psychological, and therapeutic treatment to adolescents with the conditions for which Plaintiff was placed there. Plaintiff's parents and, on information and belief, the Binghamton City School District relied on those representations in placing Plaintiff at FFS and in paying tuition and charges to Defendants, on information and belief at a rate of approximately thirty thousand dollars per year, by checks and payments transmitted from Binghamton, New York, through the United States mail, over the approximately eighteen months of Plaintiff's confinement. The District, which withdrew Plaintiff from its high school for the placement, made no determination that FFS was licensed, staffed, or equipped to provide the services for which the placement was made, and did not monitor the placement at any time. The District has since represented that it holds no record of the placement beyond Plaintiff's transcript.

46. In addition to tuition, on information and belief, FFS billed Plaintiff's family separately for incidentals, laundry, toiletries, and trips, including the Toronto trip described herein, charges that, consistent with the institution's billing practices as established by evidence at the 2025 federal criminal trial described herein, were a systematic feature of the institution's extraction of money from the families of the children in its custody.

47. Plaintiff did not go to FFS willingly, because she was not told that she was going. She was driven to the campus on January 12, 1999 by her father, who told her that she was being taken to a job interview at a summer camp, and she learned where she was only upon her arrival. FFS had arranged her enrollment and its financial terms with her parents and, on information and belief,

with the school district in advance, and, on information and belief, had counseled her father on the manner of her delivery.

**C. Compelled Strip Search and Photography**

48. Immediately upon her arrival at FFS on January 12, 1999, Plaintiff, then sixteen years old, was strip searched pursuant to FFS's intake policy, without medical screening, parental consent, or lawful authority: she was required to remove all of her clothing and to shower in the presence of a staff member and a female student, who observed her while she was naked. The student the institution used to conduct the search taunted Plaintiff with sexual remarks about Plaintiff's boyfriend as she searched her, so that the institution's first act toward the child in its custody was to strip her and sexually taunt her through another child. On information and belief, immediately after the search and before Plaintiff had been permitted to dress, FFS staff photographed her on self-developing instant film, and the photograph was placed directly into a book maintained by the institution. On information and belief, the strip search and photographing of Plaintiff were an instance of a uniform institutional practice applied to every child admitted to FFS.

49. On information and belief, FFS photographed every student at or shortly after intake, photographing students from the chest up as a baseline and photographing the entire body of any student who bore a tattoo, scar, or other distinctive mark, including students who were photographed naked. The images were captured on self-developing instant film and placed directly into books that the institution maintained and retained, and that remained in its possession and control through at least FFS's 2014 closure. FFS sent its ordinary student photography, including student journalism and activity photographs, to commercial photographic developers in the Village of Hancock for processing, but never sent the images of unclothed students to any outside

developer, confining those images to a self-developing format and to the institution's own books so that no person outside the institution would see them.

50. On information and belief, FFS supplied copies of students' intake photographs to local law enforcement, including Hancock PD and the Delaware County Sheriff's Office, as part of a standing arrangement under which officers used the institution's photographs to locate students who fled the campus and to return them to the institution's custody, and officers did use the institution's photographs for that purpose during the period of its operation.

**D. The Denial of Therapeutic and Medical Care**

51. FFS accepted Plaintiff with knowledge of the conditions for which she was placed there, an eating disorder and what had been characterized as behavioral difficulties, and represented that it would treat them. FFS employed no psychologist, psychiatrist, or licensed therapist on its staff, and Plaintiff does not recall seeing any medical or mental-health provider on the campus during her enrollment. In place of treatment, the institution required Plaintiff to identify herself as an alcoholic and an addict on the strength of her having consumed alcohol and marijuana a few times, and to confess, before the assembled students and staff, to smoking crack cocaine and to selling herself for it, neither of which had ever occurred, and it treated her eating disorder not as a condition to be treated but as a suspicion to be held against her.

52. During her enrollment, Plaintiff went approximately two weeks without a bowel movement. Her complaints were not believed. Her mother eventually came to the campus and took her to a physician at a medical practice on the South Side of Binghamton, off the campus, where X-rays showed severe constipation throughout her colon, and the physician prescribed laxatives and recommended ongoing dietary changes. One FFS staff member began to provide the prescribed laxatives and follow the diet, and was overruled within days by a more senior staff member on the

stated ground that Plaintiff would use the laxatives as part of bulimic behavior; the prescription and the dietary changes were discontinued. For the rest of her confinement Plaintiff had painful bowel movements once or twice a week, was told she was lying about it, and gained approximately seventy-five pounds under the institution's food regime. The only other medical provider Plaintiff recalls seeing during her enrollment was an eye doctor, also off the campus. Plaintiff has suffered gastrointestinal illness and chronic head, neck, shoulder, and back pain for more than twenty years since, and has been under the care of gastroenterologists for at least the last twenty years.

**E. Forced Labor**

53. Throughout her enrollment, Plaintiff performed uncompensated institutional labor that was neither incidental to nor part of any genuine therapeutic or educational program. Plaintiff was assigned to pig duty, the care of the institution's pigs; to dish duty; to laundry duty; to kitchen duty; to gardening; to stripping the institution's floors; to the scrubbing, including of the toilets, of the trailers in which the students were housed; to painting, on her recollection in the building that housed the family areas and the kitchen; to office duty; to keeping watch, for stretches of eight to twelve hours, over the children the institution had locked in the isolation closets of its gymnasium storage room, the "night watch" function the institution billed their families for; and to tutoring other students in the institution's academic program, the instruction the institution charged families for. Plaintiff was also placed in charge of the institution's store, a function of the institution's own commercial operation, and was responsible for its tasks, including the preparation of its purchase orders. On her first night at the institution, Plaintiff, who had not yet been issued a toothbrush, was made to stand in the gymnasium all evening and watch while the entire student body scrubbed its floor with toothbrushes, her introduction to the labor regime to which she was then subjected. This labor, imposed on a minor in Defendants' custody and substituted for the treatment and education

for which her family and, on information and belief, her school district were paying, was uncompensated labor extracted from a child under the threat of sanction and continued confinement.

54. FFS also used the children in its custody to perform its institutional and administrative functions: Plaintiff's tutoring of other students supplied instruction the institution represented that it provided, her office duty supplied clerical labor, and her operation of the institution's store, including the preparation of purchase orders, supplied the labor of a retail and purchasing function that a lawful institution must staff and pay for, and her hours keeping watch over the children locked in the isolation closets supplied the custodial labor the institution sold to those children's families as "night watch" at $150 per night and performed through an unpaid child. On the Toronto trip described herein, Plaintiff was made responsible for overseeing and supervising other students, a supervisory function of the institution performed by a sixteen-year-old in its custody.

55. Among the forced labor described herein, FFS assigned students to its kitchen, where Plaintiff was assigned on kitchen duty, and to receive and unload the institution's commercial food deliveries, including the recurring truck deliveries made by Sysco. Plaintiff herself unloaded Sysco's deliveries, carrying goods between the truck and the kitchen in the presence of Sysco's delivery personnel, and on kitchen duty she prepared and served the goods Sysco supplied. On information and belief, Sysco's drivers and delivery personnel returned to the campus on a regular delivery schedule and repeatedly observed minor children performing the labor of receiving and unloading its deliveries, and the volume and composition of the food FFS ordered from Sysco was materially inconsistent with the adequate feeding of the resident child population its personnel observed, a fact reflected in Sysco's own order, invoice, and delivery records. Sysco thereby

received throughout the relevant period both recurring tuition-funded payment for its goods and the direct benefit of unpaid child labor in the performance and completion of its own deliveries.

**F. Public Sexualized Humiliation, Coerced Confession, Gender-Based Control, and Food**

56. On a regular, if not daily, basis throughout her enrollment, FFS subjected Plaintiff to public sexualized psychological abuse and humiliation. At the institution's table sessions and group meetings, Plaintiff, then sixteen and seventeen, was required to declare herself an alcoholic and an addict, and was compelled to confess, before the assembled students and staff, that she had smoked crack cocaine and that she had sold herself for crack, neither of which had ever occurred. She was also made to confess to having had an abortion, though she had never been pregnant. The institution treated those coerced confessions as true and made her repeat them. At table topics, staff and senior students called Plaintiff a whore, told her that she would be used and discarded like a wet rag, and told her, repeatedly and publicly, that she would end up prostituting herself on a street corner and would die if she did not accept the program. Staff reinterpreted ordinary conduct as sexual as a matter of routine: a classmate who put out a dirty fork was accused, before the group, of masturbating, and Plaintiff was told that squeezing her legs together was masturbation. Under a "purity contract" the institution required her to report her private sexual conduct, including masturbation, to her sponsor and junior sponsor, and those disclosures were then raised and discussed at table topics before her peers.

57. During Plaintiff's enrollment, a girl in Family Three, on information and belief then under sixteen, reported that she had been sexually assaulted by a staff member. On information and belief, no report was made to any authority, the staff member was never charged, and he left the institution's employ soon afterward; the girl was brought to the table, sexually berated before the unit for weeks, and made to take responsibility for the assault. It was understood among the

students, as the institution intended, that a child who reported what had been done to her would be punished for reporting it.

58. FFS's control of the girls in its custody was directed at their bodies and appearance as female adolescents. Female classmates of Plaintiff in Family Three, two of whom she specifically recalls, had their heads shaved by the institution's leaders, an event Plaintiff photographed and recorded, and others were given punitive short haircuts on the theory that they were flirtatious or promiscuous; Plaintiff herself was subjected to the institution's "dress up" sanction, the program's term for making a student dress in other students' clothing, and was then called a whore for dressing up. Girls, including Plaintiff, were made to stand in corners without shoes. Plaintiff was routinely required to be naked in front of the other girls in her trailer, privacy being treated as concealment, and her use of the bathroom was continuously observed: even in a single-stall bathroom a staff member or student was required to be present and watching, so that in approximately eighteen months at the institution Plaintiff was never permitted to urinate, to have a bowel movement, or to attend to her menstruation in private. Together with the strip search and photographing described herein, the sexual content of the confessions extracted from Plaintiff, and the food practices described below, these practices formed a regime of institutional control directed at Plaintiff's body, appearance, and sexuality as a female adolescent.

59. FFS used food as an instrument of control. Plaintiff had been placed at FFS in part because of an eating disorder, and FFS, rather than treat it, used it against her: the institution treated her as a bulimic to be watched and disbelieved, refused on that ground the laxatives a physician had prescribed for her, and controlled what and how much she ate as part of the sanction regime: it withheld food from her as punishment, including under the "tuna and Maypo" sanction, imposed on her repeatedly, including for a period of approximately one to two weeks, and it required her at

other times to eat excessive portions, with further consequences if she did not finish what she was given. No child was permitted to refuse food or to leave a bite on her plate: Plaintiff watched a fellow student, seated across from her, vomit onto her plate at the table and be required to go on eating from it.

60. FFS staff limited, monitored, and censored students' contact with their families. FFS's Handbook required that all outgoing student mail be read and initialed by a staff mentor and all incoming mail be read by staff, barred any telephone contact for the first month of enrollment and thereafter limited students to staff-dialed calls of a few minutes each, and authorized mail and phone blackouts as sanctions, so that Plaintiff's family never observed the ordinary conditions of her confinement. In approximately eighteen months at the institution Plaintiff was permitted a single overnight visit home, on Christmas Eve 1999, from which she was returned to the campus on Christmas Day.

**G. Physical Restraint, Duct-Tape Binding, the Corner, and Isolation**

61. During Plaintiff's enrollment, FFS staff and senior students acting at staff direction physically restrained students by wrapping them in rugs or blankets and binding them with duct tape, a practice carried out in Plaintiff's presence and in the presence of the other children in her unit, who were made to witness it. The restraint practice described herein is the practice that the institution, in its May 2008 public response to congressional oversight, characterized as a benign safety measure modeled on first aid for seizures.

62. Plaintiff was made, as a sanction, to spend extended periods standing in a corner without shoes, on one occasion, near the end of her enrollment, for approximately one to two weeks, from morning until night each day, a sanction imposed after Plaintiff was accused of overspending on a school-store purchase order to which staff had themselves directed her to add items, and carried out

by the Family Three staff, including Defendants Emmanuel Argiros and Cindy Argiros, while Plaintiff was at the same time on the tuna and Maypo sanction. Plaintiff was also required, repeatedly and throughout her enrollment, as what the institution presented to her as a lesson of its program rather than a punishment, to sit alone for stretches of approximately eight to twelve hours at a time in the small, isolated storage room off the institution's gymnasium, through the wooden doors to the right of its stage, in which the institution's two locked isolation closets were located and concealed from the rest of the facility, outside the closets while other children were confined inside them, with instructions to summon staff if a child inside a closet harmed herself. That assignment was work: the institution used a sixteen-year-old in its custody to keep watch over the children it had locked in its closets, the "night watch" function for which, as alleged below, it billed those children's families $150 per night, and it paid her nothing for it. On at least one occasion Plaintiff sat in that room for hours while a girl locked in one of the closets dug at its walls and floor until her fingernails were torn and bleeding and struck her head against it repeatedly, in evident distress, and no staff member intervened. Plaintiff spent, in the aggregate, a substantial part of her eighteen months at the institution in that room, alone, without schooling; at times, under the religious and group pressure the program exerted to demonstrate loyalty to it, she sat inside an isolation closet herself, and she does not know whether its door was locked while she was inside. Isolation was held over her as a threatened punishment throughout her enrollment. The room and its doors remain on the campus today, relabeled by the campus's present operator. While Plaintiff was in the corner, in the storage room, or on work sanctions, she received no schooling; the sanctions regime displaced her education for substantial portions of her enrollment.

63. The institution's confinement of children was itself a source of revenue. The enrollment agreement FFS used in Plaintiff's era provided that "the sum of $150 per night will be billed to my

account in the event it becomes necessary to have night watch for my son/daughter," and, as Defendant Emmanuel Argiros admitted under oath at the February 2025 federal criminal trial of Paul Geer, when that agreement was received in evidence and he was confronted with that clause, the school in fact imposed a surcharge on a family's account whenever a student was kept in isolation overnight. That testimony, and the agreement itself, are part of the public record of that trial. The charge was a term of the institution's standard enrollment agreement, applied to every family that enrolled a child, including Plaintiff's family, under the agreement in force in her era. The charge was entered under a description, "night watch," that did not disclose to the family that it was paying for its child to be locked away, and no family was told that the isolation for which it was being billed was a sanction, not a safety measure. Every sanction that extended a child's stay extended the tuition the institution collected for her, and every night in isolation was billed on top of it, so that the institution profited directly from confining the children in its custody, including the children locked in the closets beside which Plaintiff was made to sit, and it staffed the watch it was billing for with Plaintiff, a child it did not pay.

64. FFS carried the labor it extracted from Plaintiff and the sanctions it imposed on her on its records as its program, and represented to her parents and, on information and belief, to her school district that she was receiving treatment and instruction. She was not. The Lackawanna College mathematics courses that Plaintiff completed while at FFS, taught by Jim Kavarnos, were the only instruction of substance she received there.

**H. Plaintiff's Escape and the Institution's Pursuit of Her**

65. In the first days of July 2000, Plaintiff escaped. She had been permitted to leave the campus only because her grandfather was dying in Florida; on the drive back from the Binghamton airport she asked her father to stop at his house, and while he was inside she ran, with a backpack holding a

change of clothes. She was seventeen. The escape had been planned in advance with the knowledge and help of two FFS staff members. She did not graduate from FFS and did not return to it as a student. Her first attempt to escape had been on her first night, January 12, 1999, when she was tackled into the barbed wire at the property's entrance.

66. The institution did not let her go. Plaintiff's mother reported her to the Binghamton police as a runaway and, told that little could be done for a seventeen-year-old so close to her majority, then reported that Plaintiff had stolen approximately eight hundred dollars from her father, which was false, and told Plaintiff that she must return to the Family Foundation School or be charged and mandated to the institution until she was twenty-one. Plaintiff's father told her, years later, that he had never made any such accusation and that the school had instructed her mother to get Plaintiff back to the institution by any means necessary, conveying to her that Plaintiff's life depended on it. On information and belief, the false accusation was made at the institution's urging and for the institution's purpose, the return of a paying child to its custody. From July 2000 until her eighteenth birthday on September 12, 2000, Plaintiff hid in an apartment in Binghamton, believing that the police were looking for her to return her to FFS, until her mother, confronted, agreed to withdraw the accusation. Plaintiff was never arrested or prosecuted.

67. At the institution's direction, Plaintiff's parents did not take her home and did not support her. FFS instructed the parents of children who left or rejected its program not to allow them to come home, not to give them money, and to discard their belongings, and Plaintiff's parents, as they told her, followed those instructions: her belongings were disposed of, and after her placement at sixteen she was not taken back into her parents' home; years later, as an adult, she rented the former family home from her father, paying rent and utilities, while he lived in Florida. Plaintiff, a minor with no family support, housed and supported herself in Binghamton while she finished high

school. When she later sought help from her parents for college, her mother, who had made the decisions concerning the program throughout, told her that FFS had instructed them not to help her financially because she was “not following the program,” by which her mother meant Plaintiff’s refusal to return to the school, and her father told her that the money that had been set aside for her education had been spent on FFS’s tuition.

68. Plaintiff re-enrolled at Binghamton High School in September 2000, her return recorded on her permanent record as of September 7, 2000, and, because FFS had provided no instruction of substance toward a diploma, had to complete the school year she would otherwise have finished with her class, which was to have graduated in 2001; she graduated on June 23, 2002, a year behind that class, at nineteen, while supporting herself. The Lackawanna College mathematics credits she had earned at FFS transferred and appear on her record; the balance of her time at FFS produced no diploma and no credit.

69. Without the funds that had been set aside for her education and without her parents’ support, Plaintiff put herself through college on grants and her own earnings, paying the balance herself: she earned an associate’s degree in 2004, but did not complete her bachelor’s degree until 2013 or a master’s degree until 2016; her father, in or after 2016, contributed to the repayment of her graduate-school loan. For more than fifteen years after she left FFS she worked primarily in low-wage jobs, with income at or below the federal poverty guidelines for her household; her recorded earnings were approximately ten thousand dollars in 2016 and approximately thirty-nine thousand dollars in 2017, the first full year after she completed her master’s degree, and have risen since. Her working life has been in community health outreach and the protection of vulnerable people.

70. The pipeline that had delivered Plaintiff to FFS at sixteen did not release her when she left. In the summer of 2004, a year after her mother’s death, when Plaintiff was twenty-one, socially

isolated, without a family home to return to, and still within the institution's influence, FFS drew her back into its service as an employee, and she worked there for approximately thirty working days. FFS paid her wages by check, on information and belief drawn on the enterprise's account at NBT Bank's Hancock branch, the only bank in the village, with the checks issued from the institution's own office, so that the same bank that had received the tuition paid for her confinement paid out, from the same relationship, the wages of the former student the institution now employed; Plaintiff cashed those checks in Binghamton and, on information and belief, on at least some occasions at the branch in Hancock. During that period, on her own observation, the sanction, labor, and humiliation practices described herein remained in operation, and the institution continued to hold out its program to placing families as treatment. Plaintiff never restrained a student and never took part in the humiliation of one. During that period a student who had left the institution at eighteen came to Plaintiff for help; the institution had provided that student no clinical services and had no clinician on its staff to provide them, and Plaintiff directed the student to services outside the institution. When the student later died, Defendant Emmanuel Argiros blamed Plaintiff, in the vocabulary of the institution's program, for that death, because the help she had given had come from outside the program. What Plaintiff saw, as an employee, was that the institution had no services to give a child who needed them and answered a child's death by assigning blame. What she did not and could not see was the financial engine beneath it: that the institution was being paid, and had been paid for her, to provide the services it did not have, and that other entities were profiting from that arrangement.

71. Plaintiff's mother remained aligned with the institution until her death in the spring of 2003; her obituary asked that memorial contributions be made to the Family School Spirit Foundation at 431 Chapel Hill Road, Hancock, on information and belief a fundraising vehicle of the enterprise,

sharing the institution's address, through which the enterprise solicited and received charitable contributions from the families of its students in addition to the tuition and charges it billed them. Plaintiff's father, on his deathbed in 2020, apologized to her for sending her there, telling her that he had not known what it was and that the placement had been her mother's idea. Plaintiff did not know, when she left FFS, that the institution had been operating under a public cease and desist order throughout her enrollment, that the institution's principals would later destroy its records, or that the trips on which she and other children had been transported across an international border were the trips on which a member of the institution's staff was transporting children for criminal sexual activity.

**I. Transport Across an International Border**

72. In or about the spring of 1999, during her enrollment, FFS transported Plaintiff, then sixteen, out of the State of New York and out of the United States to Toronto, Ontario, Canada, on a trip organized and supervised by FFS staff, in whose custody Plaintiff traveled, including Defendant Cindy Argiros and Defendant Emmanuel Argiros, both of whom accompanied the students on that trip. Plaintiff retains photographs of that trip, processed by a commercial developer in May 1999 and so dated on their reverse, so that the trip took place no later than that month, depicting the assembled students in Toronto, Defendant Cindy Argiros among them, and Defendant Emmanuel Argiros in profile. On that trip, Plaintiff was made responsible for overseeing and supervising other students. On information and belief, Plaintiff was transported to Toronto on the institution's trip again in the spring of 2000. FFS returned Plaintiff from Toronto to the campus and to the regime described herein. On information and belief, those trips were among the institution's recurring trips to Toronto, on one of which, in 2001, FFS staff member Paul Geer transported an FFS student to Toronto for the purpose of criminal sexual activity, the offense of which he was convicted on

March 3, 2025. Plaintiff, a minor in the institution's custody, had no ability to refuse the trip or the transport.

**J. Plaintiff's Education and the Cost of the Placement**

73. Plaintiff was withdrawn from Binghamton High School in the tenth grade for the placement at FFS and was confined there for approximately eighteen months, during which, apart from the Lackawanna College mathematics courses, she received no education of substance that advanced her toward a diploma. She graduated from Binghamton High School in June 2002, a year behind her class. FFS's tuition and charges for those months were paid by her parents, from funds set aside for her education, and, on information and belief, by the Binghamton City School District, for a placement that FFS represented as therapeutic and educational and that was neither.

**K. FFS's Documented Unlicensed Operation and Pattern of Concealment**

74. FFS's unlicensed and abusive operation was a matter of public record throughout Plaintiff's enrollment: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license required by New York law. Defendants continued to operate, enroll, and confine children, including Plaintiff beginning in January 1999, notwithstanding that order, without disclosing it to Plaintiff's family or to her school district. At the February 2025 federal criminal trial of Paul Geer, Defendant Emmanuel Argiros admitted under oath that FFS marketed itself to prospective parents as a therapeutic boarding school; that neither he nor his parents, the founders, was a clinical psychologist; that he was not a certified teacher and his parents had no background in the science of teaching; that the school's revenue was tuition; and that the 1999-2000 Handbook, the Handbook in force during Plaintiff's enrollment, set out the twelve-step philosophy on which the program rested. He admitted at that trial that institutional records had been destroyed, acknowledged his prior sworn testimony that

student files were destroyed with the other records, and acknowledged his prior sworn testimony that he had personally taken records to the shredder. The institution to which Plaintiff was delivered for treatment of an eating disorder had, by the admission of its own president, no clinician at its head, and the records that would have shown what it did to her were destroyed by that president's own hand. In 2008, after Plaintiff's enrollment, the practices of FFS were the subject of oversight hearings before the United States House of Representatives Committee on Education and Labor, to which the institution publicly responded, through Defendant Brain, by characterizing its restraint and sanction practices, including the restraint practice carried out in Plaintiff's presence, as benign and marketing itself as a reformed and rigorous program, while the former students it had abused, including Plaintiff, and their families remained deceived as to what had been done to them. In 2010, following complaints by former students, the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities, the Office of Mental Health, the Office of Alcoholism and Substance Abuse Services, and the State Education Department jointly investigated FFS, including a site visit in June 2010 and written correspondence with FFS in September and October 2010, and on December 29, 2010 the four agencies wrote jointly to Defendant Emmanuel Argiros, as President of FFS, stating their finding that the accounts of former students spanning approximately 2000 through 2010, a period encompassing Plaintiff's enrollment, concerning abusive practices at the institution were credible and strikingly similar to one another, and noting a 2008 visit by an accrediting body after which practices the agencies described as formerly punitive had rapidly changed. Defendants continued to operate, enroll, and confine children for four more years. Those findings concerned the treatment of children; they did not disclose, and no state agency has ever disclosed, the financial structure of the enterprise, who profited from it, or the participation of the institutional Defendants named herein.

75. Throughout and after Plaintiff's enrollment, FFS staff limited, monitored, and censored students' contact with their families, preventing full disclosure of the true conditions of confinement. On information and belief, and as later confirmed by testimony in the 2025 federal criminal trial of Paul Geer, the Argiros family, and Defendant Emmanuel Argiros as the custodian of the institution's records, deliberately destroyed student records, abuse complaints, and other institutional documentation, directly depriving Plaintiff and other former students of the evidentiary record necessary to discover and assert their claims. Plaintiff's parents are deceased and the family's records of the placement did not survive them, so that the institution's own records and its bank's records are the only surviving record of what was paid for Plaintiff's placement. FFS's Handbook required that all outgoing student mail be read and initialed by a staff mentor and all incoming mail be read by staff, barred any telephone contact for the first month of enrollment and thereafter limited students to staff-dialed calls of a few minutes each week, and authorized mail and phone blackouts as sanctions.

**L. Discovery of the Enterprise**

76. As a child in the institution's custody, Plaintiff saw and experienced instances of abuse; as an employee for thirty working days, she saw discrete day-to-day practices: she saw that children were subjected to force, hunger, and humiliation. She saw, as an employee, that a child who needed services was given none and that the institution deflected onto her the blame for that child's death. She knew, because her father had told her, that money set aside for her education had gone to the institution. She had no knowledge of the payment structure beyond that. She did not know that the institution had been paid for services it did not have, that its revenue was deposited and its credit secured at the bank that paid her wages, or which entities were involved and profiting. Plaintiff always knew that she had been mistreated at FFS; she has carried that knowledge, and been treated

for it, for her entire adult life. What she did not know, and could not have known, was that the mistreatment was the means by which an enterprise obtained her labor and her family's money, that the labor she performed was collateral for a bank's loans, that the institution had been paid, by her parents and, on information and belief, her school district, for services it did not have, that the entities named herein were profiting from that arrangement, and that the trips on which she was taken out of the country were the trips on which a staff member was transporting children for sex. Plaintiff did not discover the true, coordinated, institutional, and financial character of the enterprise responsible for her injuries until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial and, as to the financial structure of the enterprise, its bank, and the participation of the other entities named herein, until 2026, when those facts were assembled from the trial record and the public record described herein; none of it was known to her before 2025. It was the evidence and testimony adduced at that public trial that first revealed, from the mouth of the institution's own president and from its own enrollment agreement, that families were billed a nightly surcharge for the isolation of their children, so that the institution sold the confinement of the children in its custody; that the institution marketed itself as a therapeutic boarding school while its founders and its president held no clinical or teaching credentials, so that the treatment for which her parents paid had never existed to be given; that the institution's records, including student files, had been shredded by its president, so that the record of what was done to her and what was paid for it had been deliberately destroyed; that the institution's trips to Toronto were the trips on which a staff member transported children for sex; and that the Defendants named herein participated in and profited from that operation as alleged herein. That disclosure gave rise to the filing of this action. Until then, Plaintiff had no way to know that the institution that held her was selling the confinement of its children, had no services to give her, and had destroyed the

proof. A child in the enterprise's custody, taught that she was the one in the wrong, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the eight years before Plaintiff's enrollment, during the congressional hearings and State investigation that followed it, or in the fourteen years of the enterprise's operation after she escaped.

**M. Injuries and Damages**

77. As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered severe and lasting injury, including but not limited to: the loss of approximately eighteen months of her education and the delay of her high school graduation by a year; the value of eighteen months of uncompensated labor; the cuts and bruises of her first night, never treated; the seventy-five pounds gained under the institution's food regime and the untreated constipation that began there; years of psychiatric treatment and medication management, including trials of antidepressant, mood-stabilizing, and antipsychotic medication; diagnoses of post-traumatic stress disorder, anxiety, and an eating disorder, and, on June 9, 2021, upon psychiatric evaluation at the Addiction Center of Broome County in Binghamton, where she sought eye-movement desensitization therapy and psychiatric care and has never received treatment for substance use, a diagnosis of complex post-traumatic stress disorder, with hyperarousal, nightmares, flashbacks, intrusive recollections, and trigger avoidance, a positive screen for post-traumatic stress disorder, and a recorded history of the abuse at FFS, for which accelerated resolution therapy was prescribed; the withdrawal from ordinary social life from the age of eighteen to the age of thirty-one; continuous psychiatric and psychological treatment, including counseling, psychiatric medication management, eye-movement desensitization therapy, accelerated resolution therapy, somatic

therapy, and ketamine infusion treatment for complex post-traumatic stress disorder, under a succession of providers in Binghamton and, since 2021, in North Carolina, where she remains under psychiatric treatment today, and where her symptoms, severe and persistent throughout her adult life, were acutely aggravated during and after the February 2025 trial of Paul Geer; the continued exposure to the institution that her later work in community health outreach in Broome County brought her, including contact with businesses owned by or employing the institution's staff in Hancock and, on one occasion, an application by Paul Geer for a position in the program she coordinated, which left her sobbing before her colleagues; persistent night terrors, at forty-four years of age, of being hunted; persistent passive suicidal ideation, as her therapist has described it, which she has had to manage throughout her adult life; chronic head, neck, shoulder, and back pain for more than twenty years, treated with epidural and trigger-point injections, radiofrequency ablations, physical therapy, spinal decompression, and, in 2019, a cervical disc replacement; gastrointestinal illness for more than twenty years, under the care of gastroenterologists throughout that period; the loss of the funds set aside for her education, spent on the institution's tuition, and of her parents' support, withdrawn at the institution's direction, so that she was left at seventeen to house and support herself; the delay of her associate's, bachelor's, and master's degrees by years and the lost earnings and diminished earning capacity of more than fifteen years of low-wage work that followed; the destruction of her relationship with her mother, who remained aligned with the institution until her death, and the loss of her relationships with her extended family for approximately twenty years; and physical, emotional, and psychological injury, pain and suffering, humiliation, and loss of enjoyment of life.

## TOLLING OF STATUTES OF LIMITATIONS

78. Plaintiff's claims arising from conduct constituting sexual abuse, physical abuse, or degrading treatment committed against her while a minor, including the strip search and photographing of Plaintiff described herein and her claims for battery, false imprisonment, and intentional infliction of emotional distress described herein, are timely pursuant to CPLR 208(b), which extends the infancy toll applicable to such claims until the victim's fifty-fifth birthday.[1] Plaintiff was born in September 1982, and is presently forty-four years of age; her claims are accordingly timely on this independent ground alone, without regard to any other tolling doctrine set forth below.

79. Plaintiff's RICO claims are timely. Plaintiff knew that she had been abused; she did not know, and could not have discovered, that the abuse was the instrument of a racketeering enterprise that obtained her labor and her family's money and in which the Defendants named herein participated and from which they profited, until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial, and the limitations period began to run, at the earliest, upon that discovery; it was the evidence and testimony adduced at that public trial that first revealed the coordinated, institutional, and enterprise character of the conduct. Plaintiff, a child in the enterprise's custody from sixteen to seventeen years of age, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the eight years before Plaintiff's enrollment or the fourteen years of the enterprise's operation after it. Independently, all applicable limitations periods are tolled by Defendants' fraudulent concealment, the self-

[1]Plaintiff asserts no claim under CPLR 214-g. The revival window established by the Child Victims Act closed before this action was commenced. Should the Legislature reopen or extend that revival window, or enact comparable revival legislation, Plaintiff reserves the right to seek leave to amend this Complaint to assert all claims thereby revived.

concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth below.

80. Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, and 1595 are timely under 18 U.S.C. § 1595(c), together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy grounds set forth herein. Plaintiff's claims under 18 U.S.C. § 2255 are subject to no limitations period, the Eliminating Limits to Justice for Child Sex Abuse Victims Act having eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual, were not time-barred as of that date.

81. Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a) Fraudulent Concealment. Defendants engaged in a coordinated scheme of affirmative concealment including: (i) FFS staff limited, monitored, and censored students' contact with their families, including through the reading and censorship of outgoing and incoming mail and the limitation of telephone contact described in FFS's own Handbook; (ii) Defendants continued to operate FFS notwithstanding the 1990 cease and desist order, without disclosing that order to Plaintiff's family or to her school district; (iii) FFS represented to Plaintiff's family and, on information and belief, to her school district that Plaintiff was receiving therapeutic treatment and instruction, when she was receiving coerced confessions, forced labor, and the corner, taught Plaintiff herself that she was the one in the wrong, and instructed her parents, when she escaped, to withdraw their home and their support from her; (iv) FFS billed families a nightly surcharge for the isolation of their children under a description, "night watch," that did not disclose what the charge was for, as

Defendant Emmanuel Argiros admitted at the 2025 federal criminal trial; (v) the institution, through Defendant Brain, publicly minimized and mischaracterized its practices in its May 2008 response to congressional oversight hearings, and, through Defendant Emmanuel Argiros, responded to the 2010 state investigation while continuing to operate as before; (vi) on information and belief, and as Defendant Emmanuel Argiros acknowledged under oath, the Argiros family deliberately destroyed student records, abuse complaints, and institutional documentation, as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary record necessary to discover and assert her claims; and (vii) on information and belief, the institution retained and never disclosed the intake photographs it took of Plaintiff and other students. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period.

(b) Self-Concealing Conspiracy. The enterprise was structured to prevent victims from connecting their individual experiences to the broader enterprise. Its mechanisms of isolation, including the censorship of family contact described herein, the coerced confessions by which the institution made its students the authors of the false histories it kept of them, the instillation in students of the belief that they themselves were in the wrong, which Plaintiff carried for years after her escape, and the use of staff and local law enforcement to return students who fled, were themselves instruments of concealment rendering victims, including Plaintiff, structurally incapable of discovering the enterprise during enrollment or for years thereafter.

(c) Overt Acts Within the Limitations Period. The destruction of student records by the Argiros family, as established by testimony at Geer's 2025 criminal trial, constitutes an

overt act in furtherance of the conspiracy committed within the limitations period. The below-market transfer of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC in November 2014, the further transfer of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC in June 2016, and the 2014 incorporation of K9-5 Inc. immediately upon FFS's closure, each constitute further independent overt acts of asset disposition and concealment in furtherance of the conspiracy falling entirely within the limitations period.

82. Plaintiff's claim under N.Y. Social Services Law § 483-bb is timely on the grounds set forth in Count V below, including CPLR 212(e).

83. Common-law fraud and negligent misrepresentation. Plaintiff's claims are timely under CPLR 213(8), which permits an action to be commenced within the greater of six years from the fraud or two years from discovery. The two-year discovery period runs from the discovery described above, and this action is timely under both measures.

84. All applicable statutes of limitations on Plaintiff's negligence, negligence per se, and 42 U.S.C. § 1983 claims are independently tolled by the fraudulent concealment and equitable estoppel doctrines set forth above, in addition to CPLR 208(b) as set forth above.

85. Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

**COUNT I: CIVIL RICO (18 U.S.C. § 1962(c))**

**(Against All Defendants)**

86. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

87. At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution as its vehicle but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act, and operated as a continuing unit for decades, including throughout Plaintiff's 1999-2000 enrollment.

88. Each Defendant knowingly participated in the conduct of the enterprise's affairs. FFS and Defendant Betty Argiros owned, operated, and directed the enterprise, made the decisions regarding staffing, student control, and continued operation notwithstanding the 1990 cease and desist order, and financially benefited from every aspect of the enterprise's operation. Defendant Emmanuel Argiros, as president of the FFS board throughout Plaintiff's enrollment and, on information and belief, the custodian of its records, and Defendant Cindy Argiros, together with him the family head of Family Three, the unit in which Plaintiff was confined, directed the institution's operation and the forced-labor, restraint, and sanction practices described herein, personally supervised the sanctions, labor, and humiliation imposed on Plaintiff as her family heads, personally accompanied the students, including Plaintiff, on the 1999 transport to Toronto described herein, and participated in the conduct of the enterprise's affairs at the institutional level. Through its family-unit staff, Education Plus Corporation administered the labor, sanction, confession, and food regime imposed upon Plaintiff, conducted the sexualized intake search and photographing described herein, refused the medical treatment a physician had prescribed for her, confined her in the corner and in the gymnasium storage room, pursued and returned by force the children who fled it, and, when Plaintiff escaped, instructed her parents to withdraw their home and

support from her and to secure her return by any means necessary. Defendants NBT Bank, N.A. and NBT Bancorp Inc. knowingly and purposefully participated in the conduct of the enterprise's affairs, not as a passive depository but as the enterprise's secured lender. The bank extended secured credit to the enterprise and its property-holding entity, including the security interests taken from both the operating corporation and its title-holding entity on November 19, 2008, months after the congressional hearings, and took as its collateral the fruit of the children's forced labor: the tuition receivables and enrollment contracts, including Plaintiff's, the inventory and livestock the children unloaded, raised, and tended, the equipment and improvements they built and maintained, and, from March 24, 2010, the campus itself, whose upkeep was the children's daily labor. Having taken that collateral, the bank held a direct financial stake in the continuation of the operation and in the continued confinement of the children in it, because without enrolled children there was no tuition to repay it and without children to house and to labor there was no operating campus to secure it; and the bank acted on that stake, continuing and renewing its credit in 2002, 2004, 2006, 2008, 2010, 2011, 2013, and, by continuation nearly two years after the school closed, 2016, holding its lien on the enterprise's collateral every day through December 18, 2021, inspecting and appraising, on information and belief, the very campus on which the children's labor was open and visible, processing every tuition deposit, payroll check, and disbursement of the enterprise through its Village of Hancock branch, including tuition paid on Plaintiff's behalf, financing the 2014 conveyance by which the enterprise's principal asset was moved beyond the reach of its victims and collecting its own payoff from it, and taking the transferee as a new lending customer, all while disregarding the public record of FFS's unlicensed operation and the knowledge that its own underwriting, collateral inspections, and ledgers supplied, and while taking no corrective action of any kind following the 2024 indictment and 2025 conviction of Paul Geer.

That course of conduct was a choice, repeated at each renewal and each notice event, to keep the operation running because the bank's collateral and its repayment depended on it. Defendant Sysco, on information and belief, advanced and benefited from the enterprise by serving as its recurring institutional food distributor while its own personnel observed minor children, including Plaintiff, unloading its trucks. Defendant NATSAP lent membership legitimacy to FFS's fraudulent marketing representations. The Hancock Herald contributed to the enterprise's fraudulent marketing of FFS to the public. Defendant Lackawanna College, on information and belief, advanced and benefited from the enterprise by delivering college-credit coursework on the FFS campus through FFS staff, including the courses in which Plaintiff was enrolled, for which it was paid from the tuition-funded accounts described herein, and by lending the enterprise the legitimacy of accredited coursework on which placing families and school districts relied. Defendant Jeffrey Brain participated in the conduct of the enterprise's affairs by directing the enterprise's admissions, its external relations, and its public representations, including the May 2008 public response to congressional oversight described herein, continuing the enterprise's fraudulent marketing and maintaining the concealment on which its continued operation depended, and by drawing his compensation for years from the proceeds of that operation. The Village of Hancock, Town of Hancock, County of Delaware, Delaware County Sheriff's Office, and Delaware County Board of Supervisors, upon information and belief, participated in and enabled the enterprise's continued operation and concealment by permitting FFS to operate without proper licensure notwithstanding the 1990 cease and desist order and by locating children who fled FFS and returning them to its custody without inquiry, and, pleaded in the alternative, benefited economically from the enterprise's continued operation, which brought into their communities the payroll of local residents employed by the institution, the patronage of visiting families, and the

institution's recurring, tuition-funded purchasing from local suppliers. Defendants Emmanuel Argiros and Cindy Argiros continued the enterprise's pattern of concealment following FFS's 2014 closure through the below-market transfers of the FFS real property and the incorporation of Defendant K9-5 Inc. described in the Tolling section supra, transactions that dissipated the enterprise's assets and furthered its concealment from former students, including Plaintiff, with reasonably foreseeable claims arising from the conduct alleged herein. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, conducted its search dog operation in common with the enterprise's canine program, the Dog Corps, through their shared principal, Rita Argiros, the enterprise's Executive Program Director, and received the benefit of the children's unpaid labor within that operation and of the labor of the student body, including Plaintiff, that ran the institution housing it. The Highlights Defendants, upon information and belief, maintained through their own longtime employee and author, Cheripko, a continuous relationship with the enterprise, sold their publications into its purported educational program, received the benefit of the children's labor at their Wayne County retreat, and lent the enterprise the legitimacy of an established educational publisher. Defendant Chapel Hill Land Holdings LLC participated in and benefited from the enterprise's concealment by acquiring the FFS real property with notice of the claims against the transferors and, on information and belief, by retaining undisclosed on that property, for approximately a decade, the institutional records that survived the destruction described herein.

89. Paul Geer, as the director of the enterprise's choir and the custodian of children on its trips off the campus throughout Plaintiff's enrollment, conducted the enterprise's affairs on its trips, including the recurring Toronto trips described herein, while the enterprise, with knowledge of his confessed sexual misconduct with students, retained him for the value his choir brought to it and

drew his compensation for years from the enterprise's accounts; his conduct is alleged as conduct of the enterprise and of Education Plus Corporation.

**Pattern of Racketeering Activity.**

90. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over the course of Plaintiff's enrollment and the enterprise's decades-long operation:

(a) Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343: Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment and marketing materials and to collect tuition payments, including the tuition and charges paid on Plaintiff's behalf from Binghamton, New York by her parents and, on information and belief, by the Binghamton City School District, on information and belief by checks sent through the United States mail, in furtherance of the scheme to defraud families and public school districts regarding the true nature of FFS, and in furtherance of the scheme to defraud families regarding the true nature of FFS;

(b) Money Laundering, 18 U.S.C. § 1956: Defendants processed and concealed the fraudulently obtained proceeds of the enterprise through accounts maintained at NBT Bank;

(c) Forced Labor, 18 U.S.C. § 1589: Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros obtained Plaintiff's labor and services through force, physical restraint, and the scheme, plan, and pattern intended to cause Plaintiff to believe that failure to perform such labor would result in serious harm to her, including the corner, the storage room and the threat of isolation, the withholding of food

and of medical care, public sexualized humiliation at the table, the extension of her confinement, and separation from her family;

(d) Trafficking with Respect to Forced Labor, 18 U.S.C. § 1590: Defendants recruited, transported, including on the trips out of the State described herein, harbored, and obtained Plaintiff and other minors across state lines for the labor and services described herein;

(e) Transportation of Minors, 18 U.S.C. § 2423: Defendants transported minors in FFS's custody, including Plaintiff, in interstate and foreign commerce, including to Toronto, Ontario, Canada, in the personal custody of Defendants Emmanuel Argiros and Cindy Argiros, with the intent that they engage in sexual activity for which a person can be charged with a criminal offense, as established as to FFS staff member Paul Geer by his 2025 federal conviction for transporting FFS students to Maine in 1994 and to Toronto in 2001, conduct of which the institutional Defendants had knowledge and which they permitted to continue throughout Plaintiff's enrollment; and

(f) Sexual Exploitation of Children, 18 U.S.C. §§ 2251 and 2252: on information and belief, Defendants used minors in FFS's custody in the production of visual depictions of unclothed children in the course of the institution's intake photography practice, using materials that had traveled in interstate commerce, and knowingly retained those depictions.

**Continuity.**

91. The pattern of racketeering activity spanned multiple decades, encompassed numerous victims across the related actions described herein, and employed the same methods consistently over time, satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

92. Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

93. Plaintiff was injured in her business and property by reason of Defendants' racketeering activity, and those injuries are concrete, pecuniary, and documented. First, the tuition and charges paid for her placement, on information and belief approximately thirty thousand dollars per year over approximately eighteen months together with the separately billed charges for incidentals, laundry, toiletries, and trips described herein, were paid in substantial part from funds that had been set aside for Plaintiff's own college education, a fund held for her benefit, which the enterprise's fraud consumed and which was gone when she needed it; that money was a total economic loss, paid for treatment and schooling that were never delivered. Second, Defendants extracted from Plaintiff approximately eighteen months of uncompensated labor, including the commercial labor of operating the institution's store, preparing its purchase orders, tutoring other students in the instruction the institution charged families for, performing its clerical work, keeping the watch over children in its isolation closets that it billed their families $150 per night for, and supervising other students on its Toronto trip, labor whose market value Defendants retained and which displaced the wages of the employees a lawful institution must pay. Third, the enterprise took from Plaintiff eighteen months of secondary education for which it was paid and delivered none beyond the mathematics credits described herein, so that she was required to repeat a year of high school, a year behind her class, while paying for her own housing and support. Fourth, by instructing her parents, when she escaped, to withhold their home and support from her, the enterprise deprived Plaintiff at seventeen of the financial support on which she was entitled to rely and compelled her

to pay for her own housing and support while a minor still in school. Fifth, the loss of the education fund and of family support delayed Plaintiff's associate's degree to 2004, her bachelor's degree to 2013, and her master's degree to 2016, and confined her for more than fifteen years to low-wage work at or below the federal poverty guidelines, a loss of earnings measurable year by year against her own Social Security earnings record, which shows her income rising from approximately ten thousand dollars in 2016 to approximately thirty-nine thousand dollars in 2017, the first full year after she completed the degree she had been prevented from completing for more than a decade; the difference between what she earned in those years and what she would have earned had her education not been taken from her and delayed is a direct financial injury to her property. These injuries are independent of any psychological injury and directly traceable to Defendants' racketeering, including the fraudulent extraction of the tuition, the forced labor, and the withdrawal of her family's support procured by the enterprise. Plaintiff is entitled to recover threefold her damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Statute of Limitations.**

94. All applicable limitations periods are tolled as set forth in the Tolling section supra.

## <u>COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d))</u>

**(Against All Defendants)**

95. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

96. Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise described in Count I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and

knowingly agreed to participate in, facilitate, and further it. Under Salinas v. United States, 522 U.S. 52 (1997), a defendant may be liable for RICO conspiracy upon proof that it agreed to the overall objective of the conspiracy, that the enterprise's affairs be conducted through a pattern of racketeering activity, whether or not that defendant agreed to commit, or itself committed, any two or more predicate acts.

97. Each Defendant's agreement is evidenced by its own knowing, sustained participation in the scheme, as alleged in the Enterprise allegations of Count I above and incorporated here: Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros agreed to and did direct and administer the institution's continued unlicensed operation, enrollment, and confinement of children, including Plaintiff, notwithstanding the 1990 cease and desist order, and the forced-labor, restraint, isolation, food-deprivation, confession, and sanction practices through which the enterprise's affairs were conducted, and personally conducted the transport of the children, including Plaintiff, to Toronto; Defendants NBT Bank, N.A. and NBT Bancorp Inc. agreed to and did continue, for decades and through 2026, to maintain the enterprise's accounts, to extend and renew secured credit against collateral that was the fruit of the children's forced labor, to hold thereby a financial interest in the operation's continuation and in the continued confinement of the children whose labor secured and repaid that credit, to finance the 2014 disposition of the enterprise's principal asset, and to refrain from filing any Suspicious Activity Report or making any disclosure to a regulator or law enforcement agency, despite escalating notice culminating in the 2024 indictment and 2025 conviction of Paul Geer, an agreement evidenced by the renewal of that credit at each of 2002, 2004, 2006, 2008, 2010, 2011, 2013, 2015, and 2016, and by the lien it chose to hold through December 18, 2021; Defendant Sysco agreed to and did continue its recurring, tuition-funded supply relationship with the enterprise while its own drivers observed the

child labor from which it benefited; Defendant Eagle Valley agreed to and did, through its own founder and president, conduct its canine operation in common with the enterprise and take the benefit of the children's unpaid labor; the Highlights Defendants agreed to and did maintain their relationship with the enterprise through their embedded author while selling their publications into it and taking the benefit of the children's labor at their retreat; Defendant Lackawanna College agreed to and did continue delivering and collecting payment for coursework on the campus through the enterprise's own staff while lending the enterprise the legitimacy of accredited coursework; Defendant NATSAP agreed to and did continue collecting membership dues from the enterprise while lending it the accreditation on which placing families and school districts relied; Defendant The Hancock Herald agreed to and did continue publishing content promoting the enterprise's legitimacy while omitting matters of public concern regarding its operation; Defendant Jeffrey Brain agreed to and did continue directing the enterprise's admissions and public relations, including authoring or approving the May 2008 congressional response described herein, while drawing his compensation from the enterprise's proceeds; and Defendants Emmanuel Argiros and Cindy Argiros agreed to and did, following the 2014 closure, direct the disposition of the enterprise's remaining assets through Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it.

98. Overt acts committed in furtherance of the conspiracy, within the applicable limitations period, include: the deliberate destruction of student records, abuse complaints, and other institutional documentation by the Argiros family, as confirmed by testimony at Paul Geer's 2025 federal criminal trial; the November 2014 below-market conveyance of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC; the June 2016 conveyance of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC; the 2014 incorporation of Defendant K9-5 Inc. immediately upon FFS's closure; Chapel Hill Land Holdings LLC's continued concealment, for approximately a decade following the 2014 closure, of surviving institutional records on the former campus property, until their recovery by federal law enforcement pursuant to a search warrant; and NBT Bank's continued maintenance of, and failure to report or disclose, the enterprise's account relationships following the 2024 indictment and March 3, 2025 conviction of Paul Geer, a course of silence continuing through 2026 and through the filing of this action. Each of these acts was committed within the limitations period and independently satisfies the overt-act requirement of the conspiracy alleged in this Count.

99. Plaintiff was injured in her business and property by reason of the predicate acts of racketeering, and the overt acts, committed in furtherance of the conspiracy alleged in this Count, in the same respects set forth in Count I above, and is entitled to recover threefold the damages she sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). All applicable limitations periods are tolled as set forth in the Tolling section supra.

## COUNT III: FORCED LABOR, 18 U.S.C. §§ 1589 AND 1595

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

100. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, acting through the staff members and senior students described herein, knowingly obtained Plaintiff's labor and services, including her pig duty, dish duty, laundry duty, kitchen duty, gardening, floor stripping, the scrubbing of the trailers and the painting of its buildings, office duty, tutoring of other students, operation of the institution's store and preparation of its purchase orders, the keeping of watch over children locked in the institution's isolation closets, and supervision of other students on the Toronto trip, by means of force and physical restraint, including her tackling into barbed wire when she tried to escape on her first night, confinement to the campus, confinement to a corner, assignment for extended periods to the gymnasium storage room in which the isolation closets were kept, and the restraint and duct-tape binding of students carried out in her presence; by means of serious harm and threats of serious harm, including the withholding of medical care, the use of food against her, public sexualized humiliation at the table, and the punishment, before her eyes, of a girl who reported a staff member's sexual assault; by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor, she would suffer serious harm, including restraint and isolation, public humiliation, the censorship of her family contact, sanction, the extension of her confinement, and her interception and return by law enforcement if she fled; and by means of the abuse of the position of legal custody and control Defendants held over Plaintiff, a minor throughout her enrollment. The operation of FFS was a single, continuous venture engaged in violations of 18 U.S.C. §§ 1589 and 1590 by the same methods and on the same campus from its founding through its 2014 closure, including after October 28, 2000, and Defendants' retention and continued use, within that period, of the labor Plaintiff provided and of the campus, structures, inventory, and receivables it produced, and their pursuit of her after she escaped, were part of that continuing venture.

102. As a direct and proximate result of this forced labor, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## COUNT IV: NBT BANK OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT

## (18 U.S.C. §§ 1591(d) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

103. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

104. At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for the Argiros Defendants individually, through which the financial proceeds of the enterprise were deposited, transferred, and disbursed.

105. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the sexual exploitation of the children in FFS's custody, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. § 1591. NBT Bank obstructed, attempted to obstruct, and interfered with that enforcement by maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship,

notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, including the December 2, 2002 filing made two years after Plaintiff's departure, against collateral her labor had built, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the underwriting, collateral inspection, and financial review that its March 24, 2010 loan against the campus required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students, notice renewed and confirmed upon his conviction on March 3, 2025 after a public two-week trial. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is independent of, and does not await, any request from law enforcement, and arose anew at each stage. At each stage, NBT Bank's obligations of customer due diligence and suspicious-activity

reporting required inquiry; at each stage, the bank chose the continued receipt of fees, interest, and deposits over compliance. On information and belief, the bank's own payroll ledger for the enterprise records every paycheck issued to Paul Geer through 2014, the entire period during which FFS retained him after learning of his confessed sexual misconduct with students; after his indictment and conviction publicly established what those payments had bought, the bank did not review, freeze, report, or otherwise act upon the accounts through which he had been paid or the accounts of the principals who had kept him. On information and belief, the bank also took no step, after the indictment or the conviction, to freeze or review the accounts of Chapel Hill Land Holdings LLC, whose purchase of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call, terminate, or withdraw the credit it had extended against that property.

106. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

107. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action.

Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT V: NY SOC. SERV. LAW § 483-bb (CHILD VICTIMS OF LABOR TRAFFICKING)**

**(Against All Defendants)**

108. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

109. N.Y. Social Services Law § 483-bb(c) provides a civil cause of action to an individual who is a victim of conduct prohibited by N.Y. Penal Law §§ 135.35 (labor trafficking) and 135.37 (aggravated labor trafficking), and permits recovery not only against the perpetrator of such conduct but also against whoever knowingly advances or profits from, or should have known he or she was advancing or profiting from, an act in violation of those provisions.

110. While a minor in Defendants' custody, Plaintiff was the victim of labor trafficking: she was recruited from Binghamton through the out-of-district placement described herein, transported to Hancock by pretext, and harbored at FFS on the misrepresentations described herein, and she was compelled to provide labor and services, including the pig duty, dish, laundry, kitchen, gardening, floor-stripping, trailer-scrubbing, painting, office, tutoring, store-operation, purchasing, isolation-closet watch, and trip-supervision labor described herein, by means of physical restraint, including her tackling into barbed wire, confinement to a corner and assignment to the gymnasium storage room, and the restraint and duct-tape binding of students carried out in her presence, the withholding of medical care, the use of food against her, public sexualized humiliation and coerced confession, the censorship of her family contact, and the institutional sanction regime, under which any resistance extended her confinement. The gravamen of this Count is the trafficking and forced

labor itself; the strip search, photographing, and gender-based control alleged herein are pleaded as instruments of that coercion, and Plaintiff's claims for the offenses committed against her person are pleaded separately in Count XI pursuant to CPLR 208(b).

111. Each Defendant engaged in, advanced, or profited from, or should have known it was advancing or profiting from, that labor trafficking, in the same respects and for the same reasons set forth as to each Defendant in the Enterprise allegations of Count I. NBT Bank, N.A. and NBT Bancorp Inc. profited from the account relationships through which the proceeds of the operation, including tuition paid on Plaintiff's behalf, were deposited, processed, and disbursed, and from the secured credit whose collateral was, in substantial part, the product of the children's labor, including the floors Plaintiff stripped, the trailers she scrubbed, the buildings she painted, the grounds she gardened, the kitchen she staffed, the livestock she tended, and the food inventory she handled; Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. held, received, and continue to hold and benefit from property and assets of the operation, including property improved and maintained by student labor and, as to Chapel Hill Land Holdings LLC, the continuing commercial use, season after season through the present, of the campus buildings and grounds the children built and maintained; Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, profited from the unpaid labor of the enterprise's children in the canine operation conducted in common with it by its own founder and president, and from the labor of the student body, including Plaintiff, that ran the institution housing that operation; the Highlights Defendants, upon information and belief, advanced the trafficking through their continuous relationship with the enterprise's embedded staff and profited from the enterprise's purchases of their publications and from the labor of its children at their retreat; NATSAP received membership dues from FFS while lending it the institutional legitimacy

on which enrolling families and school districts relied; Sysco profited from, and should have known it was profiting from, that labor trafficking, its own personnel having observed the children unloading its trucks while Plaintiff, on kitchen duty, prepared and served the goods it supplied; Lackawanna College profited from, and should have known it was profiting from, that labor trafficking, receiving payment through the enterprise's tuition-funded accounts for coursework delivered on the campus by the enterprise's staff, including the courses in which Plaintiff was enrolled, and lending the operation the legitimacy on which its continued enrollment of children depended; the Binghamton City School District advanced that trafficking, and should have known that it was advancing it, by placing Plaintiff in the institution and, on information and belief, paying public funds for her continued confinement there for approximately eighteen months, without determining that the institution was licensed or staffed to provide the services for which it placed her and without monitoring the placement, notwithstanding the public cease and desist order described herein; Jeffrey Brain profited from and advanced that labor trafficking, drawing his compensation from an operation whose revenues, facilities, and going-concern value were the product of the labor of its students, including Plaintiff, and advancing, through the public concealment described herein, the operation's continuation; and the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors advanced that trafficking by permitting the institution's continued, unlicensed operation within their jurisdictions notwithstanding the official notice described herein and by locating and returning to the institution students who fled it, and, pleaded in the alternative, profited from that continued operation as alleged in Count I.

112. Social Services Law § 483-bb(c)(ii) provides that an action under that subdivision shall be commenced within fifteen years of the date on which the trafficking victim was freed from the

trafficking situation or, if the victim was a minor when the act of human trafficking occurred, within fifteen years after the date the victim attains the age of majority, and CPLR 212(e) provides that the period does not begin to run, and is tolled, during any period in which the victim is or remains subject to such conduct, as Plaintiff remained through July 2000. The running of that period is further tolled and suspended under § 483-bb(c)(iii) and (iii)(A) by Plaintiff's minority until September 12, 2000 and by the incapacity described herein, including the post-traumatic stress disorder, complex post-traumatic stress disorder, anxiety, and eating disorder for which she has required continuous psychiatric treatment; under § 483-bb(c)(iv) by his inability, due to circumstances resulting from the trafficking situation and the concealment described herein, reasonably to discover his cause of action; and under § 483-bb(c)(iii)(C) by Defendants' conduct inducing delay in the filing of this action and causing duress upon him, as described herein, which estops them from asserting the limitations defense; and under § 483-bb(c)(iii)(D) each such suspension applies to all other related claims arising out of the trafficking situation alleged herein. Plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally.

## COUNT VI: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

113. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

115. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, who acknowledged his prior sworn testimony that student files were destroyed with the institution's other records and that he personally took records to the shredder, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her intake and the intake photograph, the refusal of the medical treatment a physician had prescribed for her, the trips on which she was taken to Toronto, her flight on her first night and her return to the campus by force, the restraint and isolation of children, the report by a girl in her unit of a staff member's sexual assault and the punishment that followed it, and the complaints and reports of students concerning the sexual conduct of staff. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, after FFS had been sued civilly and while Defendant Argiros was concerned about his own civil exposure, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by destroying the evidentiary record of the sex trafficking of FFS students for which Paul Geer was later prosecuted.

116. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

117. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT VII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Education Plus Corporation and Emmanuel Argiros)**

118. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

119. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

120. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, who acknowledged his prior sworn testimony that student files were destroyed with the institution's other records and that he personally took records to the shredder, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her sanctions and labor assignments, her work in the institution's store and its purchase orders, her food restrictions, and the payments made on her behalf by her parents and, on information and belief, her

school district. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by destroying the evidentiary record of the operation's forced-labor practices, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals.

121. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

122. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT VIII: OBSTRUCTION OF LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

123. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124. 18 U.S.C. § 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of that section. 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

125. As alleged herein, the operation of FFS recruited, transported, harbored, and obtained minor children, including Plaintiff, for labor and services, and NBT Bank maintained the accounts through which the financial proceeds of that operation were deposited, transferred, and disbursed. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the forced labor of the children in FFS's custody, which the government itself described in charging that staff member, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. §§ 1589 and 1590. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by maintaining that account relationship and continuing to process the operation's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, including the December 2, 2002 filing made two years after Plaintiff's departure, against collateral her labor had built, whose collateral was the operation's inventory, livestock, accounts, and enrollment contracts, the knowledge of its Hancock

branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the March 24, 2010 loan against the campus that the children's labor had improved and maintained, together with the underwriting, collateral inspection, and financial review that credit required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer, notice renewed and confirmed upon his conviction on March 3, 2025. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is independent of, and does not await, any request from law enforcement, and arose anew at each stage. No enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals; the concealment the bank's conduct sustained prevented that enforcement.

126. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been

taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

127. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims arising from the forced-labor operation described herein and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT IX: NEGLIGENT FAILURE TO PROVIDE PROMISED THERAPEUTIC SERVICES, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, N.Y. GEN. BUS. LAW § 349

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

128. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d).

129. Defendants owed Plaintiff a distinct duty of reasonable care arising from their express representations, made to Plaintiff's parents and, on information and belief, to the Binghamton City School District, that FFS would provide qualified therapeutic treatment and a high school education to Plaintiff, a girl placed there for an eating disorder and what had been characterized as behavioral difficulties. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services, by the refusal of the medical treatment a physician had prescribed for her, and was compounded by FFS's substitution of forced labor, coerced confession, public sexualized humiliation, the corner, the storage room, and the use of her eating disorder against her for any genuine treatment of Plaintiff, and by its presentation of the compliance that fear produced as therapeutic progress, so that the conditions for which Plaintiff was placed there were masked rather than treated during the years in which they could have been treated.

130. Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, or licensed therapeutic or addiction-treatment professionals; (b) accepting into their custody a sixteen-year-old with an eating disorder and what had been characterized as behavioral difficulties without any qualified clinical staff to treat her, and treating her eating disorder as a suspicion to be held against her rather than a condition to be treated; (c) failing to conduct any meaningful evaluation, diagnosis, or treatment planning for Plaintiff, who never received treatment from a qualified professional during her enrollment; (d) substituting forced labor, coerced confession, public sexualized humiliation, the corner, the storage room, and fear for genuine treatment; (e) subjecting Plaintiff to an intake strip search and, on information and belief, photographing, without medical screening, parental consent, or lawful authority, in the presence of and conducted by another student; (f) refusing the laxatives and dietary changes a

physician had prescribed for her on the ground that she might misuse them; (g) withholding food from her as a sanction and requiring her at other times to eat excessive portions; (h) compelling her to confess publicly to drug use, prostitution, and an abortion that had never occurred; (i) requiring a child to sit alone for extended periods in an isolated storage room beside locked closets in which other children were confined, and holding isolation over her as a threat; (j) instructing her parents, when she escaped, to withdraw their home and their support from her; and (k) continuing to enroll and confine students, including Plaintiff, notwithstanding the 1990 cease and desist order. Defendants' representations that FFS was a qualified therapeutic institution and a school constitute deceptive acts and practices within the meaning of N.Y. General Business Law § 349, directed at consumers generally through FFS's marketing materials and causing Plaintiff's family the actual injury of tuition and charges paid for services never rendered.

131. As a direct and proximate result of Defendants' negligent, fraudulent, and deceptive conduct, independently of any other theory of liability in this Complaint, Plaintiff suffered the injuries described herein and is entitled to compensatory damages and punitive damages. This claim is timely pursuant to CPLR 213(8) and N.Y. General Business Law § 349(c), as set forth in the Tolling section supra.

## COUNT X: NEGLIGENCE AND NEGLIGENT SUPERVISION, HIRING, AND RETENTION

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and the Binghamton City School District)**

132. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding and following counts, Defendants owed

Plaintiff and other enrolled minor students a non-delegable duty of reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff and by the institution's own custodial and disciplinary practices.

133. Defendants breached that duty by, among other things: continuing to operate and enroll students, including Plaintiff, notwithstanding the 1990 cease and desist order; accepting into their custody a sixteen-year-old with an eating disorder and what had been characterized as behavioral difficulties without any qualified clinical staff to treat her; directing, permitting, and conducting an intake strip search and, on information and belief, photographing of Plaintiff, without medical screening, parental consent, or lawful authority, and using another student to conduct it; pursuing a child who ran on her first night and tackling her into barbed wire, and leaving her injuries untreated; compelling Plaintiff to confess publicly to drug use and prostitution that had never occurred; adopting and enforcing a restraint practice under which minor students were wrapped in rugs and bound with duct tape by staff and senior students in the presence of other children, including Plaintiff; delegating the physical restraint of children to other children; requiring Plaintiff to sit alone for extended periods in the isolated storage room in which the institution kept its locked isolation closets, beside children confined in them; imposing sustained forced labor on Plaintiff, including the operation of the institution's store and the supervision of other students; refusing the medical treatment a physician had prescribed for her; punishing, before Plaintiff and her unit, a girl who reported a staff member's sexual assault, and retaining that staff member until she left; hiring, retaining, and placing in unsupervised authority over children Paul Geer, whom the administration knew, from his own confession to its staff, had engaged in sexual misconduct with students, and who has since been convicted of transporting FFS students for the purpose of sexual activity, together with the staff who administered the sanction, restraint, and family-contact

practices described herein; transporting Plaintiff across an international border in the custody of its staff; housing Plaintiff in a trailer on the campus; and instructing her parents, when she escaped, not to take her home and not to support her. This conduct created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained. The Binghamton City School District breached its own duty of reasonable care to Plaintiff, a student for whom it was responsible, by placing her in an out-of-district residential institution without determining that the institution held the license, the clinical staff, or the services required to treat the conditions for which it placed her there, when the institution's unlicensed operation was a matter of public record; by failing to ensure that the services for which the placement was made existed; by failing to monitor the placement at any time during the approximately eighteen months it remained in force; and by leaving the placement in force while Plaintiff was subjected to the conduct described herein, conduct that created an unreasonable and foreseeable risk of the harm Plaintiff sustained.

134. As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XI: ASSAULT, BATTERY, FALSE IMPRISONMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

135. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

136. The intake strip search to which Plaintiff was subjected, including her being stripped and made to shower naked before a staff member and a student who sexually taunted her as she searched her, and, on information and belief, the photographing of her unclothed, constituted an

assault and a battery upon her, then a minor, without consent or lawful justification. The search was conducted pursuant to the uniform intake policy adopted, directed, and enforced by Defendants Education Plus Corporation and Betty Argiros, and these Defendants are directly liable, together with the staff and the student who carried it out at their direction, for the battery committed in execution of that policy. The tackling of Plaintiff into barbed wire by a staff member and a senior student on her first night, leaving her cut and bruised and untreated, constituted an assault and a battery upon her. The staff who held Plaintiff on a campus she could not leave, who confined her to the corner and assigned her to the gymnasium storage room, who tackled her when she fled, and who, when she escaped, procured through her parents and a false accusation to the police her return by threat, committed false imprisonment upon Plaintiff. Each such act was performed in execution of the sanction and confinement policies adopted, directed, and enforced by the Defendants named in this Count and within the scope of the duties they assigned, and these Defendants are directly and vicariously liable for them.

137. Independently, the course of conduct described herein, including the intake strip search and photographing of a sixteen-year-old girl, the sexual taunting of her by the student made to search her, her tackling into barbed wire, the coerced public confessions to prostitution, drug use, and an abortion that had never occurred, the daily sexualized humiliation at the table, the refusal of the medical treatment a physician had prescribed for her, the use of her eating disorder against her, the corner and the storage room, the punishment before her of a girl who reported a staff member's sexual assault, the restraint and binding of children in her presence, and the instruction to her parents, when she escaped, to withdraw their home and support from her and to procure her return by any means necessary, was extreme and outrageous, was undertaken intentionally or with

reckless disregard of the substantial certainty that it would cause severe emotional distress, and did cause Plaintiff severe and ongoing emotional distress.

138. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XII: COMMON-LAW FRAUD AND FRAUDULENT CONCEALMENT (CPLR 213(8))

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

139. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

140. Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain, directly and through FFS staff, knowingly made material misrepresentations of fact to Plaintiff’s parents and, on information and belief, to the Binghamton City School District, including that FFS was a qualified therapeutic boarding school staffed to provide treatment, psychological and psychiatric services, a high school education, and a supervised residential environment, that Plaintiff would receive qualified treatment for the eating disorder and the behavioral difficulties for which she was said to have been placed there, that Plaintiff would receive an education, and that Plaintiff was making therapeutic progress, and, to Plaintiff herself, that she was an addict and the one in the wrong. Each of these representations was false when made, was known by these Defendants to be false, and was made with the intent that Plaintiff’s parents and the District rely upon it. These Defendants also concealed from Plaintiff’s parents, while holding their daughter in its custody, that the institution operated under a public cease and

desist order, that it employed no qualified treatment professionals, that it had refused the medical treatment a physician had prescribed for her, that it was billing families a nightly surcharge for the isolation of their children under the description “night watch,” that its practices were later the subject of congressional oversight hearings whose findings it publicly minimized, and that it retained on staff a man who had confessed to sexual misconduct with students.

141. Plaintiff’s parents and, on information and belief, the Binghamton City School District reasonably relied on those misrepresentations, procuring and paying for Plaintiff’s placement, surrendering Plaintiff to Defendants’ custody for approximately eighteen months, and paying the separately billed charges described herein. Plaintiff’s parents were never told of the 1990 cease and desist order. Defendants reinforced and concealed the fraud through the devices described herein, including the monitoring and censorship of Plaintiff’s family contact, the coerced confessions by which the institution made Plaintiff the author of the false history it kept of her, the presentation of fear-induced compliance as therapeutic progress, the instruction to her parents, when she escaped, that she was not to be believed, housed, or supported, the May 2008 public minimization of the institution’s practices, made after Plaintiff had left its custody, which kept her family deceived, and the destruction of institutional records, so that the true conditions of her confinement could not be discovered.

142. Defendants Emmanuel Argiros and Cindy Argiros separately and independently perpetuated that concealment following FFS’s 2014 closure. Through the transfers described in the Tolling section supra, and through their purposeful silence following the 2025 public disclosure of the enterprise’s conduct at Geer’s federal criminal trial, Defendants Emmanuel Argiros and Cindy Argiros took no step to disclose, correct, or come forward with the truth concerning the conduct to which Plaintiff and other FFS students had been subjected, notwithstanding their knowledge of it,

and instead moved the enterprise's remaining assets beyond the reach of the students, including Plaintiff, who had been defrauded and injured. Defendant Jeffrey Brain furthered that concealment through the May 2008 congressional response described herein.

143. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8) and the Tolling allegations set forth supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

## COUNT XIII: COMMON-LAW AIDING AND ABETTING FRAUD

**(Against Jeffrey Brain)**

144. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

145. As set forth in Count XII, Education Plus Corporation and the Argiros Defendants perpetrated a fraud upon Plaintiff and her parents through material misrepresentations concerning the nature of FFS and the services for which they charged, upon which Plaintiff's parents relied to their detriment.

146. Defendant Jeffrey Brain had actual knowledge of that fraud. As Director of Admissions and Vice President for External Relations from approximately 2005 through the institution's 2014 closure, he directed the admissions and external relations apparatus through which the same representations that had been made to Plaintiff's family were made to the families who followed; he knew that the institution employed no licensed psychiatrist, psychologist, or clinician; he knew the sanction, labor, and confinement practices in use on the campus, because in May 2008 he was the named contact for and, on information and belief, an author or approving officer of the institution's public response minimizing those practices to a congressional committee; and, on

information and belief, he knew that the institution operated under the public cease and desist order described herein.

147. Defendant Brain substantially assisted the fraud in its concealment phase: by publicly minimizing the institution's practices in May 2008, a public statement that kept the families of former students, including Plaintiff's, deceived as to what had been done to their children and delayed Plaintiff's discovery of her claims; by directing the recruiting and marketing through which families were induced to enroll and to keep paying on the same representations that had been made to Plaintiff's family; and by continuing that recruitment and concealment through the institution's 2014 closure, perpetuating the fraud practiced on Plaintiff's family and the concealment of it.

148. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8), measured from Plaintiff's discovery as alleged supra, and all applicable statutes of limitations are otherwise tolled as set forth supra. Plaintiff is entitled to compensatory and punitive damages from Defendant Brain.

## COUNT XIV: TRAFFICKING WITH RESPECT TO FORCED LABOR (18 U.S.C. §§ 1590 AND 1595)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

149. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

150. Throughout Plaintiff's enrollment, from January 12, 1999 through her escape in July 2000, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros knowingly recruited Plaintiff through the out-of-district placement and the representations to her parents and school district described herein, caused and directed her transport by pretext from

Binghamton to the FFS campus, harbored, maintained, and obtained Plaintiff, a minor in their custody, for labor and services in violation of 18 U.S.C. § 1589, including the pig duty, dish, laundry, kitchen, gardening, floor-stripping, trailer-scrubbing, painting, office, tutoring, store-operation, purchasing, isolation-closet watch, and trip-supervision labor described herein, transported her out of and back into the United States on the Toronto trips described herein, on which she was made to labor by supervising other students, and held her at the FFS campus under the regime of confinement, humiliation, sanction, isolation, and censored family contact alleged herein, in violation of 18 U.S.C. § 1590. That venture continued, by the same methods and on the same campus, after October 28, 2000 and through the School's 2014 closure, and Defendants' retention and continued use within that period of the labor Plaintiff provided and of what it produced were part of it.

151. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## <u>COUNT XV: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)</u>

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

152. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

154. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by harboring and concealing the surviving records of the enterprise. Upon acquiring the FFS campus in November 2014, Chapel Hill Land Holdings LLC held on that property, in an outbuilding, institutional records of FFS that had survived the destruction described herein, and those records remained concealed there, within its possession and control as the property's owner, for approximately a decade, never voluntarily disclosed or produced to law enforcement, and were recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial, the prosecution of federal sex offenses committed against FFS students.

155. At no time before that recovery did Chapel Hill Land Holdings LLC disclose the existence of those records to any authority, and at no time before or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has it made any report or any voluntary disclosure concerning the enterprise whose principal asset it received. Each month of that continued concealment and silence constitutes a fresh act of obstruction within the limitations period. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding, harbored and concealed the same records and made the same non-disclosure. On October 2, 2026, after written notice to preserve the outbuilding and its contents and a request to inspect them, Chapel Hill Land Holdings LLC through its attorneys denied awareness of any such structure and refused inspection, as alleged in paragraph 23; that denial, made after notice and after the federal agent's sworn testimony that the records had been recovered from that structure, is a further and continuing act of obstruction by both Defendants named in this Count.

156. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff’s own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys’ fees, and costs. All applicable limitations periods are tolled as set forth supra.

## **COUNT XVI: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

157. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

158. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

159. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by harboring on its property, in an outbuilding, the surviving institutional records of the enterprise, including, upon information and belief, records of the operation’s labor practices, sanctions, finances, and the enrollment of the children whose labor ran it, until their recovery by federal law enforcement pursuant to a search warrant, and by making no voluntary disclosure at any time. Its concealment withheld from enforcement the documentary record of the forced-labor operation alleged herein, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding,

harbored and concealed the same records, and the October 2, 2026 denial and refusal of inspection alleged in paragraph 23, made after written notice to preserve, is a further and continuing act of obstruction by both Defendants named in this Count.

160. Each month of that continued concealment and silence, including following the 2024 federal indictment of Paul Geer and his conviction on March 3, 2025, constitutes a fresh act of obstruction within the limitations period. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XVII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

161. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

162. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

163. Throughout the relevant period, including throughout Plaintiff's 1999-2000 enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries from the tuition-funded accounts described herein. At those recurring deliveries Sysco's own

drivers observed, and received the benefit of, the labor of the children of the institution, who unloaded Sysco's trucks as part of the uncompensated labor regime alleged herein, delivery after delivery, year after year, without any adult labor crew in their place. Plaintiff, on the institution's kitchen and dish duty, prepared and served for the entire school the food Sysco delivered and, on information and belief, was among the children who unloaded it from its trucks in the presence of Sysco's delivery personnel.

164. Sysco's notice was accordingly of a different character from that of any other Defendant: not financial inference but direct physical observation, its own employees on the campus taking the work of children's hands off its own trucks. Its benefit was likewise direct and twofold: years of recurring institutional sales revenue paid from the operation's tuition-funded accounts, and the children's unloading labor itself, received without cost at each delivery.

165. Sysco obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by continuing to supply and service the operation, and to accept payment and the children's labor from it, while making no report and no disclosure to any authority at any time, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025. Its silence protected a revenue stream its own personnel could observe was serviced by children, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

166. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Sysco's silence prolonged the concealment of the operation's forced labor economy, in which its own supply relationship was embedded, and thereby delayed Plaintiff's discovery and assertion of her claims. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against Sysco Corporation

and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XVIII: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)**

**(Against Jeffrey Brain)**

167. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

168. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

169. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

170. At no time, then or since, including after the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students and after his conviction on March 3, 2025, has Brain

made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

171. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XIX: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Jeffrey Brain)**

172. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

173. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

174. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse and forced labor in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional labor practices alleged in this Complaint. With that knowledge,

Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

175. At no time, then or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

176. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XX: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, Sysco Syracuse, LLC, Chapel Hill Land Holdings LLC, and French Woods Performing Arts Inc.)**

177. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

178. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein: it obtained the labor and services of the children in its custody, including Plaintiff, by force, physical restraint, serious harm, and the abuse of its custodial position, and it recruited,

transported, harbored, and obtained those children for that labor. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact, or in circumstances in which it should have known, that the venture obtained the labor and services of the children in its custody, including Plaintiff, by the unlawful means alleged herein.

179. The benefits received include: as to Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, the children's labor itself, which ran the institution and displaced the wages a lawful residential school must pay, together with the tuition margins undiminished by labor costs; as to Jeffrey Brain, compensation for his role in the operation; as to Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc., real property and successor assets improved, maintained, and built with the unpaid labor of the children, and, as to Eagle Valley, upon information and belief, the care, maintenance, and training of dogs supported by the unpaid labor of FFS students in the canine operation conducted by its own founder and president, and the benefit of the labor of the student body, including Plaintiff, that ran the institution housing that operation; as to the Highlights Defendants, upon information and belief, the portion of the enterprise's tuition-funded money that flowed to them through the integration of their publications into the purported education the venture sold, together with the uncompensated labor of FFS students at their Wayne County retreat; as to The Hancock Herald, revenues derived from its promotional relationship with the operation; as to NATSAP, membership dues paid from the operation's revenues; and as to the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors, upon information and belief, the economic benefit of the operation's continuation within their communities, as alleged in Count I.

180. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

**COUNT XXI: KNOWING BENEFICIARIES OF SEX TRAFFICKING (18 U.S.C. §§ 1591(a)(2) AND 1595)**

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, and Sysco Syracuse, LLC)**

181. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

182. The operation of FFS was a venture engaged in violations of 18 U.S.C. § 1591, as alleged herein, including the sex trafficking of children in its custody established by the federal criminal conviction of FFS staff member Paul Geer alleged herein, the sexualized intake practices, including the strip search conducted through a student who sexually taunted her and the photographing of her unclothed, to which Plaintiff herself was subjected, and the transport of Plaintiff, a minor, out of the country to Toronto in the custody of the institution's staff while it kept Geer in charge of its trips. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact that the venture engaged in the sex trafficking of children in its custody. As to Education Plus Corporation and the Argiros Defendants, that knowledge was actual: the venture's administration had been told, years before Plaintiff's arrival, that Geer had confessed to sexual misconduct with students, had refused to remove him because of the value of his choir to the institution, had reported nothing to anyone; on information and belief, in or about 2001, after Plaintiff's escape, a student whom Geer had sexually assaulted on a chorus trip to Toronto reported the assault to Emmanuel Argiros, and no report was made and no action taken; and the venture kept

Geer on staff and in custody of children, including on the recurring Toronto trips on which Plaintiff was transported, throughout Plaintiff's enrollment.

183. The benefits received by each Defendant named in this Count are those set forth in Count XX, each of which flowed from a venture that was, at the same time and through the same principals, engaged in the sex trafficking of the children whose labor produced them.

184. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## COUNT XXII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

185. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

186. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein. NBT Bank, N.A. knowingly benefited, financially and by receiving things of value, from participation in that venture: it maintained the operation's accounts and those of its principals, processed the operation's payroll, held blanket security interests in the operation's assets, including its tuition receivables and enrollment contracts, among them the contract under which Plaintiff was enrolled, extended secured credit to the operation and its property-holding entity, and received fees, interest, and deposit balances swollen by the wages the operation never paid, including in connection with the tuition paid on Plaintiff's behalf. The bank's relationship with the venture was not that of a passive depository: it was the venture's secured lender, it underwrote and, on information and belief, inspected and appraised the very campus on which the children labored, it held liens on the operation's inventory, accounts, and contract rights from 2002 forward, first

taken on December 2, 2002, two years after Plaintiff's departure, and renewed and expanded thereafter, and it held, from March 24, 2010, a mortgage on the campus itself; and after the school closed it continued to receive things of value from the venture, holding its lien on the enterprise's collateral by continuation through December 18, 2021, holding its lien on the transferee of the campus from February 27, 2015 through February 27, 2020, and, on information and belief, collecting interest, fees, and the proceeds of the enterprise's assets throughout, benefits received within the years immediately preceding the filing of this action.

187. The bank's collateral was, in substantial part, itself the product of the children's labor. The campus real property securing its March 24, 2010 loan to the title-holding family entity, and the equipment, inventory, livestock, and improvements swept by its blanket security interests, including the first interest, taken on December 2, 2002, two years after Plaintiff's departure, were built, renovated, maintained, and improved by the unpaid labor of the children in the venture's custody, so that the forced labor alleged herein directly enhanced and preserved the value of the collateral securing the bank's own position, and the bank held, through its liens, a direct financial stake in the product of that labor. Plaintiff's own labor is part of that collateral: the pigs she tended were the livestock the bank's liens expressly covered; the floors she stripped, the trailers she scrubbed, the buildings she painted, and the grounds she gardened were the upkeep of the very real property against which the bank lent and in which it held its security; the purchase orders she prepared for the institution's store were its inventory and its contract rights; and the food she prepared and served was the inventory covered by that lien, stocked into the bank's collateral by a child's hands. A lawful residential school pays adults to do that work; this venture had children do it, and the bank's collateral was worth more, and its borrower more creditworthy, for every hour of it. The bank therefore held a direct financial interest in the continuation of the operation and in the

continued confinement of the children in it: without enrolled children there was no tuition to repay the bank, and without children to house there was no operating campus to secure it.

188. NBT Bank knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means, for the reasons and on the notice progression set forth in Counts IV and VIII supra, including the public record of the operation's unlicensed operation, the 2008 congressional hearings, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, the secured-lender knowledge arising from its own collateral position in the operation's receivables, inventory, and real property, including, upon information and belief, the repeated inspection and appraisal of the campus incident to its secured lending against it over the life of the relationship, on which the children's labor maintaining that collateral was open and visible, and the financial records that passed through its own ledgers, which showed an operation whose only revenue was tuition and whose expenditures on the children were a fraction of what any lawful residential facility spends, and which, on information and belief, included, year after year through 2014, the payroll of a staff member whose confessed sexual misconduct with students the administration had chosen to keep on staff; and, in the alternative, if the bank did not conduct the inspections, appraisals, and financial reviews its own standards required, its departure from those standards was a deliberate avoidance of the knowledge they would have supplied. NBT Bancorp Inc. is liable as its controlling parent as alleged herein. Among the things of value NBT Bank received from the venture were the deposit, lending, fee, and payoff revenue described herein and, on information and belief, the standing and business it drew from being held out as the community's bank through

organizations the School's president ran. NBT Bank was not a passive depository of the venture's funds: it was the venture's secured lender, its mortgagee, and the holder and processor of its payroll, in a continuous relationship that ran from before the first lien through the conveyance it financed and the transferee it took, and its participation in the venture was, for those reasons, beyond that of a provider of routine financial services.

189. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT XXIII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

190. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

191. The operation of FFS was a single, continuous venture from its founding through its 2014 closure, engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein, by the same methods and on the same campus throughout, including during Plaintiff's enrollment. Sysco knowingly benefited, financially and by receiving things of value, from participation in that venture. Throughout the relevant period, including throughout Plaintiff's enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries, delivery after delivery, year after year, from the tuition-funded accounts described herein, tuition the operation retained as margin because it paid no wages for the labor the children performed. Sysco's participation was not that of an arm's-length vendor. At each recurring delivery it received

the children's labor itself, without cost, in the unloading of its own trucks by the children of the institution, without any adult labor crew in their place. Plaintiff, on the institution's kitchen and dish duty, prepared and served for the entire school the food Sysco delivered and, on information and belief, was among the children who unloaded it from its trucks in the presence of Sysco's delivery personnel. The benefits Sysco received were thus twofold and direct: years of recurring institutional sales revenue paid from the proceeds of the venture, and the children's unloading labor, including Plaintiff's, received at the truck at every delivery.

192. Sysco knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means. Its knowledge was of a different character from that of any other Defendant: not financial inference but direct physical observation. Sysco's own delivery personnel were on the campus at every delivery, taking the work of children's hands off Sysco's own trucks, and Sysco's own delivery volume showed that it was provisioning an institutional kitchen for hundreds of residents that, on its employees' own observation, was stocked and staffed by the children it was feeding. That knowledge, acquired by Sysco's employees in the course of their duties, is the knowledge of Sysco. Sysco made no inquiry, no report, and no disclosure to any authority at any time, and continued to supply the operation, to accept payment from it, and to accept the children's unloading labor throughout.

193. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from Sysco Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XXIV: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

194. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

195. Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc. knowingly benefited, financially and by receiving things of value, from participation in the venture alleged herein, which obtained the labor and services of the children in its custody, including Plaintiff, by the means prohibited by 18 U.S.C. §§ 1589 and 1590. The thing of value they received was the venture's principal asset: the campus at 431 Chapel Hill Road and every dormitory, dining facility, chapel, field, and improvement on it, built, repaired, cleaned, and maintained over decades by the uncompensated labor of FFS students, including the floors Plaintiff herself stripped, the trailers she scrubbed, the buildings she painted, the grounds she gardened, and the kitchen she staffed between 1999 and

196. Chapel Hill Land Holdings LLC received that asset in November 2014 for less than its assessed value, from an insider, on the venture's own lender's financing, with the venture's records in an outbuilding on the premises; French Woods Performing Arts Inc. took possession of it and has operated it as a residential camp every season since, housing, feeding, and charging campers for the structures the children built, at a charge, on information and belief, of up to approximately $16,000 per camper per summer. Each season's revenue is a benefit received from the fruits of the children's labor, and each is a benefit received within the years immediately preceding the filing of this action. Their participation in that venture was not that of an arm's-length purchaser. The venture's conduct did not end with the School's closure: its conveyance of the campus, its concealment of the records kept on that campus, and its retention of the proceeds continued through

2014 and after, and these Defendants participated in those acts, taking the venture's principal asset from the venture's own insider entity in its wind-down, at less than its assessed value, on the venture's own lender's financing, with the venture's records on the premises, through a principal who sits, beside the venture's own lender's branch manager, on the board of the corporation the venture's president presides over, and continuing the venture's use of the campus and its structures as a residential facility for children every season since, charging, on information and belief, up to approximately $16,000 per camper per summer for the dormitories, dining facilities, chapel, and grounds the children built and maintained without pay. A venture that has engaged in forced labor does not cease to be one because its campus passed to a participant with notice who continues to profit from the fruits of that labor every season, and these Defendants knew or should have known that the venture had engaged in the violations alleged herein.

197. These Defendants knew, or in the circumstances alleged herein should have known, that the venture from which they benefited had obtained that labor by unlawful means: their principal was a neighbor and friend of the Argiros family for many years and sat with the School's president on the board of Hancock Partners, Inc.; the School had been publicly accused, publicly investigated by four State agencies, and publicly closed before the conveyance; the structures they took were visibly the work of children, built on a campus whose published program was that its students built and maintained it; the School's records sat in an outbuilding under their control for a decade; and, after the 2024 federal indictment, the 2025 public trial at which the School's president admitted the destruction of records, the March 3, 2025 conviction, and written notice in September 2026 to preserve the outbuilding and its contents, they denied its existence and refused inspection. They have never disclosed what they received or what they held, and they continue to receive the benefit today.

198. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally, together with disgorgement of the benefits they received from the venture. All applicable limitations periods are tolled as set forth supra.

## COUNT XXV: CIVIL REMEDY FOR PERSONAL INJURIES (18 U.S.C. § 2255 VIA 18 U.S.C. §§ 2423(a), 2251, AND 2252)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

199. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

200. Plaintiff, while a minor, was a victim of violations of 18 U.S.C. § 2423(a). In or about the spring of 1999, no later than May 1999, and, on information and belief, again in the spring of 2000, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros knowingly transported Plaintiff, then sixteen and seventeen years old, in foreign commerce from the FFS campus in New York to Toronto, Ontario, Canada and back, in the personal custody of Defendants Emmanuel Argiros and Cindy Argiros, who accompanied the students on the 1999 trip. Among the purposes of that transport, which need not have been its sole purpose, was that Plaintiff be returned to and continue to be subjected to the regime described herein, including the strip search and photographing that Defendants' uniform intake and re-entry policy required of children entering the institution's custody, conduct constituting sexual activity for which a person can be charged with a criminal offense under New York law, including the use of a child in a sexual performance; and the trips were among the institution's recurring Toronto trips, conducted under the same supervision and in the same course of conduct as the 2001 Toronto trip on which, as established by his March 3, 2025 conviction, an FFS staff member whom the institution kept in

charge of its trips transported an FFS student for the purpose of criminal sexual activity. Defendants acted in concert with one another within the meaning of 18 U.S.C. § 2423(e). Plaintiff, while a minor, was additionally a victim of violations of 18 U.S.C. §§ 2251 and 2252. During Plaintiff's January 1999 intake, as described herein, Defendant Education Plus Corporation, acting through the staff who carried out the uniform intake policy that it and Defendants Betty Argiros, Emmanuel Argiros, and Cindy Argiros adopted, directed, and enforced, used and employed Plaintiff, then a sixteen-year-old minor, in the production of a visual depiction of Plaintiff taken, on information and belief, in the course of and immediately after the intake strip search described herein and before Plaintiff had been permitted to dress, depicting her unclothed, in violation of 18 U.S.C. § 2251, using photographic film, cameras, and materials that had been mailed, shipped, and transported in interstate and foreign commerce; and, on information and belief, that photograph was placed directly into a book maintained by the institution and knowingly retained and possessed by Defendant Education Plus Corporation through at least FFS's 2014 closure, in violation of 18 U.S.C. § 2252.

201. As a direct and proximate result of those violations, Plaintiff suffered personal injuries as alleged herein, including the injuries arising from the strip search, the photographing, and the institution's retention of that image of her. Pursuant to 18 U.S.C. § 2255, Plaintiff is entitled to recover her actual damages, and in any event liquidated damages in the amount provided by 18 U.S.C. § 2255 of no less than $150,000, together with the cost of the action and reasonable attorneys' fees. This Count is subject to no limitations period, and all applicable limitations periods are in any event tolled as set forth supra.

**COUNT XXVI: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983: FOURTEENTH AMENDMENT: STATE-CREATED DANGER AND DELIBERATE INDIFFERENCE TO KNOWN ABUSE**

**(Against the Village of Hancock, New York, individually and through the Village of Hancock Police Department; the Town of Hancock, New York; the County of Delaware, New York; the Delaware County Sheriff's Office; and the Delaware County Board of Supervisors)**

202. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

203. At all relevant times, the Village of Hancock, acting through Hancock PD, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors acted under color of state law within the meaning of 42 U.S.C. §

204. Plaintiff possessed a constitutionally protected liberty interest in personal security and bodily integrity under the Fourteenth Amendment.

205. Throughout Plaintiff's enrollment, on information and belief, Hancock PD maintained a standing practice and custom of locating children who ran away from FFS and returning them to the institution's custody without inquiry into why they had fled, and FFS students, including Plaintiff, understood that flight was futile because the institution's staff, its dogs, and the local police would return them. By affirmatively returning runaway children to a private actor whose unlicensed operation was a matter of official record, without inquiry, Hancock PD created and enhanced the danger to every child confined at FFS, including Plaintiff, foreclosed the one avenue of escape and report a confined child had, and rendered Plaintiff more vulnerable than she would otherwise have been, in violation of her substantive due process rights. Plaintiff fled the campus on her first night and was run down by the institution's staff and tackled into barbed wire; she

understood from that pursuit, from the institution's supply of students' intake photographs to the local police described herein, and from the threat conveyed to her through her mother when she finally escaped, that flight was futile and that the local police would return her as well. The practice was carried out pursuant to the standing custom of Hancock PD, for which the Village is liable.

206. Upon information and belief, and consistent with the pattern of deliberate indifference alleged as to other FFS students across multiple years, Hancock PD and the Delaware County Sheriff's Office were aware of the 1990 cease and desist order, the official notice record described herein, including the December 2010 joint findings of four New York State agencies, and the pattern of abuse those records evidenced, and nonetheless permitted FFS to continue operating without effective oversight throughout Plaintiff's 1999-2000 enrollment, including after a child's death on the campus, including by returning children who fled the campus to the custody of the enterprise. The Town of Hancock, within whose borders the FFS campus operated and whose officials possessed the same notice record, likewise permitted FFS to operate without effective oversight, and that failure constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the Town is liable. The Delaware County Board of Supervisors' failure to exercise oversight authority over the Sheriff's Office notwithstanding that knowledge constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the County is liable.

207. As a direct and proximate result of Defendants' conduct and deliberate indifference, Plaintiff continued to suffer conditions that would have been halted had Defendants fulfilled their constitutional obligations, including the forced labor, coerced confession, humiliation, isolation, and confinement described herein. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988. All applicable statutes of limitations are tolled as set forth supra.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kathleen Haggerty respectfully demands judgment against Defendants, jointly and severally, as follows:

(A) Compensatory damages in an amount to be determined at trial, but in no event less than $5,000,000, including the cost of past and future medical, psychiatric, and therapeutic care, lost earnings and earning capacity, the value of the uncompensated labor extracted from Plaintiff, and restitution of all tuition and charges paid;

(B) Treble damages pursuant to 18 U.S.C. § 1964(c) on Plaintiff's RICO claims, in no event less than $15,000,000;

(C) Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

(D) Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 1595, N.Y. Social Services Law § 483-bb(c), 18 U.S.C. § 2255, 42 U.S.C. § 1988, and all other applicable statutes;

(E) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F) Declaratory and injunctive relief as appropriate; and

(G) Any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York
October 10, 2026

Respectfully submitted,

JOHANNESEN & UMANA, P.C.

*Attorneys for Plaintiff*

By: ______________________________

Elizabeth Sarah Johannesen, Esq.

*Founding Partner*

68 Jay Street, Suite 225

Brooklyn, New York 11201

P: (631) 559-1018

elizabethsarahjohannesen@esjlaw.info

## VERIFICATION

STATE OF NORTH CAROLINA )
) ss.:
COUNTY OF WAKE )

I, Kathleen Haggerty, am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The contents are true to my own knowledge, except as to matters alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on: 10.13.26

______________________________
Kathleen Haggerty